United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 01, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 20-70295** |
| **FATIH OZCELEBI,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

### MEMORANDUM OPINION

"Falsehood flies, and the Truth comes limping after it . . . ."[1]  After two decades of contentious litigation in state court, Dr. K.V. Chowdary obtained a final judgment against his former employee and colleague, Dr. Fatih Ozcelebi, and is now the largest non-insider creditor in this subchapter V proceeding holding a two-million-dollar allowed claim.  Dr. Ozcelebi's bankruptcy case has been no less contentious, resulting in numerous contested hearings before this Court. Throughout the course of those hearings, the numerous falsehoods put forth by Dr. Ozcelebi were slowly revealed as the truth has finally caught up.

On November 29, 2021, the Court conducted an evidentiary hearing on confirmation of Dr. Ozcelebi's subchapter V plan of reorganization.  Dr. Chowdary, the subchapter V trustee, and the United States Trustee all objected to confirmation.  On December 6, 2021, the United States Trustee went a step further, filing a motion seeking conversion of this case to chapter 7.  Dr. Chowdary joined the United States Trustee in that request.  On January 5, 2022, the Court conducted a hearing on the United States Trustee's motion to convert, and considered, sua sponte, whether debtor should remain in possession or be removed pursuant to 11 U.S.C. § 1185(a).

---

[1] Jonathan Swift, *The Examiner No. 15* (1710).

For the reasons set forth herein, this Court grants in part the "Motion of the United States Trustee to Convert Case,"[2] along with "Chowdary's Joinder in (Doc#296) Motion of the United States Trustee to Convert Case."[3]  The Court finds cause to convert Debtor's case for gross mismanagement pursuant to § 1112(b)(4)(B).  As to the remainder of the statutory grounds raised, the Motion is denied.  Additionally, based on the Court's findings below, the Court finds cause to convert this case pursuant to § 1112(b)(1) for Debtor's bad faith not only in filing this case, but in carrying out his duties under §§ 521 and 1187(b) of the Bankruptcy Code and the instant subchapter V proceeding is converted to chapter 7.  Conversion of this case to chapter 7 is dispositive, and therefore, "Chowdary's Objection to Debtor's First Amended Plan"[4] filed by Dr. K.V. Chowdary, M.D., individually and doing business as Valley Gastroenterology, Clinic, P.A. on November 22, 2021, the "Notice of Subchapter V Trustee's Position on Debtor's Amended Plan of Reorganization"[5] filed by Catherine Stone Curtis, on November 22, 2021 and treated as an objection, and the "Objection of the United States Trustee to Debtor's Amended Subchapter V Plan of Reorganization"[6] filed by Kevin M. Epstein, on November 22, 2021 are denied as moot.  Likewise, confirmation of "Debtor's Amended Subchapter V Plan of Reorganization,"[7] which includes two supplements: "Supplement to Debtor's Amended Subchapter V Plan of Reorganization"[8] and "Second Supplement to Debtor's Amended Subchapter V Plan of Reorganization"[9] is denied as moot. Lastly, this Court's sua sponte consideration under § 1185(a) of whether Dr. Ozcelebi should remain as debtor in possession as an alternative to conversion is moot.

---

[2] ECF No. 296.
[3] ECF No. 321.
[4] ECF No. 277.
[5] ECF No. 278.
[6] ECF No. 279.
[7] ECF No. 259.
[8] ECF No. 265.
[9] ECF No. 285.

# I.   BACKGROUND

Dr. Fatih Ozcelebi ("*Dr. Ozcelebi*" or "*Debtor*") is a gastroenterologist employed by McAllen Gastroenterology Clinic, L.P. ("*Clinic*").  Dr. Ozcelebi formed the Clinic as a Texas limited partnership in 2006.[10]  Dr. Ozcelebi is the only gastroenterologist employed by the Clinic.[11]  Julie Ozcelebi ("*Mrs. Ozcelebi*"), Debtor's non-filing spouse, is a registered nurse and the Clinic's business manager.[12]  The Clinic's general partner is Fatih Ozcelebi MD Management, LLC ("*Fatih Management*"), which holds a .1% partnership interest therein.[13]  The remaining 99.9% partnership interest is held by Lyra Heritage Trust ("*Lyra*"), the Clinic's limited partner.[14]  Profit derived from the services provided at the Clinic is transferred to Lyra.[15]  Lyra was formed in 2007 as a Texas trust.[16]  Debtor and Mrs. Ozcelebi are 50/50 beneficiaries of Lyra.[17]  Debtor's brother, Cengiz Ozcelebi ("*Cengiz*"), is Lyra's trustee.  Lyra also holds a 99% ownership interest in Fatih Management.[18]  The remaining 1% interest in Fatih Management is held by Mrs. Ozcelebi.[19]

Dr. Ozcelebi also performs procedures at the Endoscopy Center at Ridge Plaza L.P. ("*Endoscopy Center*") along with three other gastroenterologists.[20]  The Endoscopy Center was formed by Dr. Ozcelebi as a Texas limited partnership in 2002.[21]  The Endoscopy Center's general partner is Endoscopy Center at Ridge Plaza Management, LLC, which holds a 1% partnership interest therein.[22]  McAllen Business Management, LP ("*McAllen Business*"), a limited partner of the

---

[10] ECF No. 281-57.
[11] ECF No. 290 at 111:23–25.
[12] ECF No. 35.  *See also* ECF No. 11 at 1, ¶ 4.
[13] ECF No. 281-57.
[14] ECF Nos. 281-33–39; *see also* ECF No. 265 at 4.
[15] ECF No. 223 at 67:1–4, 96:18–97:1; ECF No. 281-70.
[16] ECF No. 247-3.
[17] *Id.*
[18] ECF Nos. 281-33–39; *see also* ECF No. 265 at 4.
[19] ECF Nos. 281-33–39; *see also* ECF No. 265 at 4.
[20] ECF No. 290 at 112:1–5.
[21] ECF No. 281-52; ECF No. 223 at 75:17–23.
[22] ECF No. 281-52; ECF No. 281-1.

Endoscopy Center, holds a 39.5% partnership interest therein.[23]  McAllen Business also holds a 50% membership interest in Endoscopy Center at Ridge Plaza Management, LLC.[24]  The Endoscopy Center at Ridge Plaza Management, LLC regularly disburses the Endoscopy Center's profits to its owners, which includes McAllen Business.[25]

Vega Heritage Trust ("*Vega*") holds a 99.8% partnership interest in McAllen Business.[26]  Vega was formed as a Texas trust in 2007.[27]  Debtor and Mrs. Ozcelebi are 50/50 beneficiaries of Vega.[28]  Cengiz is Vega's trustee.[29]  Mission Business Management, LLC ("*Mission Business*") holds the remaining 0.2% partnership interest in McAllen Business.[30]  Vega also holds a 99% membership interest in Mission Business and Mrs. Ozcelebi holds the remaining 1%.[31]  McAllen Business transfers the money it receives from the Endoscopy Center to Vega.[32]

Debtor and Mrs. Ozcelebi are 50/50 beneficiaries of one other trust, Solano Heritage Trust ("*Solano*," and together with Lyra and Vega, "*Trusts*").[33]  Solano was formed as a Texas trust in 2010.[34]  Debtor's nephew, Kaan Ozcelebi ("*Kaan*"), is the trustee.[35]  Solano owns an investment account valued at $7,519,021.78 as of August 10, 2021.[36]  Solano also has membership interest in five LLCs: Vulcan Oilfield Services of Texas LLC (4%), Alliance Oil and Gas Services, LLC (3%),

---

[23] ECF No. 223 at 76:11–13.
[24] ECF No. 285-1.
[25] ECF No. 223 at 75:17–76:17.
[26] ECF No. 285-1.
[27] ECF No. 247-2.
[28] *Id.*
[29] *Id.*
[30] ECF Nos. 281-33, 281-34, 281-35, 281-36, 281-37, 281-38, 281-39; *see also* ECF No. 285-1 at 3.
[31] ECF No. 285-1.
[32] ECF No. 223 at 75:17–77:9.
[33] ECF No. 286-6.
[34] *Id.*
[35] ECF No. 285-1.
[36] ECF No. 279-7 at 6.

Efficient Construction Operation, LLC (5%), Horseshoe Hay Farm, LLC (99.9%), and Solano Land, LLC (99.9%).[37]

Before Dr. Ozcelebi formed the Clinic and the Endoscopy Center, he worked for Dr. K.V. Chowdary ("*Dr. Chowdary*").  In 1997, Dr. Chowdary sued Dr. Ozcelebi in state court.[38]  In 2016, Dr. Chowdary prevailed, obtaining a $1.8 million dollar judgment against Dr. Ozcelebi.[39]  After unsuccessful appeals to the Texas Court of Appeals and the Texas Supreme Court,[40] Dr. Ozcelebi filed his initial petition under chapter 11, subchapter V of title 11 of the Code on October 16, 2020.[41]

Debtor was ordered to file a plan no later than January 14, 2021, pursuant to 11 U.S.C. § 1189(b).[42]  Before Debtor filed his plan, Dr. Chowdary filed a motion to convert or dismiss case, or alternatively, for authority to pursue chapter 5 causes of action against insiders,[43] which was set for hearing on January 14, 2021.  On December 20, 2020, Dr. Chowdary filed a motion to expedite the January 14, 2021 hearing because, inter alia, "[o]n December 18, Dr. Chowdary's counsel was informed that the Debtor's brother, supposedly as the trustee of the Debtor's fraudulently created trusts, was seeking to remove the Debtor as a beneficiary of the trusts."[44]

The same day, Debtor filed an objection to Dr. Chowdary's motion to expedite the January 14, 2021 hearing, arguing that a hearing would not be necessary because Debtor's brother, who resides in Turkey, was unfamiliar with U.S. bankruptcy law and that upon learning of such action, "counsel for Debtor advised the Debtor that such a removal may violate the automatic stay and

---

[37] ECF No. 285-1.
[38] ECF No. 281-67 at 4.
[39] *See* Claim No. 1.
[40] ECF No. 281-87.
[41] ECF No. 1.  Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e., §) thereof refers to the corresponding section in 11 U.S.C.
[42] ECF No. 21.
[43] ECF No. 39.
[44] ECF No. 51.

was likely voidable.  Upon communicating this to the Debtor, the Debtor requested that the Trustee rescind any purported removal.  The removal of the Debtor as beneficiary of the Trusts was subsequently rescinded, vitiating any alleged emergency."[45]  On December 22, 2020, the Court held a hearing on the sole issue of Debtor's beneficial interest in the Trusts and after taking evidence, the Court was satisfied that although Debtor's beneficial interests were removed by Cengiz, they were in fact restored at the time of the hearing.[46]

Thereafter, on January 7, 2021, Debtor objected to Dr. Chowdary's motion to convert or dismiss Debtor's case.[47]  On January 14, 2021, the Court held a hearing on Dr. Chowdary's motion to convert or dismiss ("*January 2021 Hearing*").  The Court denied the motion.[48]

On January 12, 2021, Dr. Chowdary filed an objection to Debtor's claimed exemptions.[49]  On January 13, 2021, Debtor filed his first plan of reorganization.[50]  On February 2, 2021, Debtor filed an objection to Dr. Chowdary's objection to Debtor's claimed exemptions.[51]  Given the pending matters, Debtor, Dr. Chowdary, Cengiz, and Kaan submitted a "Joint Emergency Motion for Mediation Order" anticipating a contested confirmation hearing.[52]  The Court granted their request.[53]  However, on April 30, 2021, the parties announced that mediation was unsuccessful.[54]  The Court set a hearing for September 2, 2021, later rescheduled for September 7, 2021, on confirmation and Dr. Chowdary's objection to Debtor's claimed exemptions.[55]

---

[45] ECF No. 52.
[46] Min. Entry December 22, 2020.
[47] ECF No. 63.
[48] Min. Entry January 14, 2021.
[49] ECF No. 71.
[50] ECF No. 76.
[51] ECF No. 106.
[52] ECF No. 113.
[53] ECF No. 118.
[54] Min. Entry April 30, 2021.
[55] ECF Nos. 160, 171.

On August 26, 2021, Catherine Curtis ("*Subchapter V Trustee*") filed her "Notice of Sub-chapter V Trustee's Position on Debtor's Plan of Reorganization"[56] and Dr. Chowdary filed "Chowdary's Objection to Debtor's Plan."[57]  On September 7, 2021, the Court held a confirmation hearing ("*September Hearing*").  The hearing was continued to September 15, 2021.[58]

On September 9, 2021, before the continued hearing however, Dr. Chowdary filed an "Emergency Motion to Summarily Deny Confirmation of Fraudulent Plan."[59]  On September 14, 2021, the parties agreed to reschedule the September 15, 2021 hearing for October 12, 2021.[60]  On September 15, 2021, Dr. Chowdary filed his "Second Motion of Dr. K.V. Chowdary, M.D. to Convert Case"[61] ("*Second Motion to Convert*").  Dr. Chowdary's Second Motion to Convert was scheduled for hearing on October 12, 2021 as well.[62]

On September 30, 2021, Debtor filed his "Objection to Chowdary's Emergency Motion to Summarily Deny Confirmation of Fraudulent Plan."[63]  On October 6, 2021, Debtor filed his "ob-jection to Second Motion of Dr. K.V. Chowdary, M.D. to Convert Case."[64]  On October 12, 2021, the Court held a combined hearing on all pending matters ("*October Hearing*").  At the October Hearing, the UST made an oral motion to dismiss Debtor's case.[65]  At the conclusion of the hear-ing, the Court denied Dr. Chowdary's Second Motion to Convert, his "Emergency Motion to Sum-marily Deny Confirmation of Fraudulent Plan," and the UST's verbal motion to dismiss the case.[66]

---

[56] ECF No. 198.
[57] ECF No. 200.
[58] ECF No. 225.
[59] ECF No. 224.
[60] ECF Nos. 231, 232.
[61] ECF No. 233.
[62] ECF No. 234.
[63] ECF No. 239.
[64] ECF No. 240.
[65] Min. Entry October 12, 2021.
[66] *Id.*

With the express consent of all of the parties, confirmation was continued to November 29, 2021.[67] Debtor was ordered to file an amended plan, if any, not later than October 19, 2021, which was later extended by agreement of the parties.[68]  The parties also agreed to reset the hearing on Dr. Chowdary's objection to Debtor's claimed exemptions to October 18, 2021.[69]  On October 18, 2021, however, an "Agreed Order on Chowdary's Objection to Debtor's Claimed Exemptions (Doc #71)" ("*Agreed Order on Exemptions*") was filed jointly by Debtor and Dr. Chowdary.[70]  The same day, this Court signed and entered the Agreed Order on Exemptions.[71]

On October 19, 2021, Debtor filed an "Unopposed Emergency Motion to Extend Time for Filing Amended Plan."[72]  The motion was granted.[73]  On October 22, 2021, Debtor filed his amended plan of reorganization ("*Amended Plan*").[74]  On November 12, 2021, Debtor filed a supplement to the amended plan ("*First Plan Supplement*").[75]  On November 22, 2021, Dr. Chowdary filed an objection to Debtor's Amended Plan ("*Dr. Chowdary's Objection*"),[76] the Subchapter V Trustee filed her second "Notice of Subchapter V Trustee's Position on Debtor's Amended Plan of Reorganization ("*Subchapter V Trustee's Objection*"),[77] and Kevin M. Epstein ("*UST*") filed an objection to Debtor's Amended Plan ("*UST's Objection*").[78]  On November 26, 2021, Debtor filed a second supplement to the amended plan ("*Second Plan Supplement*").[79]

---

[67] *Id.*
[68] *Id.*; ECF Nos. 253, 254.
[69] Min. Entry October 12, 2021.
[70] ECF No. 251.
[71] ECF No. 252.
[72] ECF No. 253.
[73] ECF No. 254.
[74] ECF No. 259.
[75] ECF No. 265.
[76] ECF No. 277.
[77] ECF No. 278.
[78] ECF No. 279.
[79] ECF No. 285.

On November 29, 2021, the Court held a hearing on confirmation of Debtor's Amended Plan ("*November Hearing*"). On December 6, 2021, the UST[80] and Debtor[81] filed post-hearing briefing as permitted by the Court. Dr. Chowdary filed proposed findings of fact and conclusions of law.[82] The UST also filed its "Motion of the United States Trustee to Convert Case" ("*Motion to Convert*").[83] On December 13, 2021, the Court, sua sponte, issued an order placing parties on notice that in conjunction with the UST's Motion to Convert, the Court would also consider whether Fatih Ozcelebi should remain as debtor in possession or be removed pursuant to 11 U.S.C. § 1185(a).[84] On December 23, 2021, Chowdary filed its "Joinder in (Doc #296) Motion of the United States Trustee to Convert Case."[85] On December 29, 2021, Debtor filed his "Objection to the United States Trustee's Motion to Convert" ("*Objection*").[86]

On January 5, 2022, the Court held a hearing on the UST's Motion to Convert and whether Fatih Ozcelebi should be removed as debtor in possession ("*January 2022 Hearing*"). At the conclusion of January 2022 Hearing, the Court ordered the parties to submit briefs.[87] On January 26, 2022, Dr. Chowdary filed "Chowdary's Proposed Findings of Fact and Conclusions of Law, on U.S. Trustee's Motion to Convert Case to Chapter 7."[88] The same day, the UST filed its "Post-Trial Brief of the United States Trustee" ("*UST's Post-Hearing Brief*")[89] On February 9, 2022, Debtor filed his "Debtor's Brief with Respect to the United States Trustee's Motion to Convert

---

[80] ECF No. 295.
[81] ECF No. 298.
[82] ECF No. 297.
[83] ECF No. 296.
[84] ECF No. 312.
[85] ECF No. 321.
[86] ECF No. 326.
[87] Min. Entry January 14, 2021.
[88] ECF No. 348.
[89] ECF No. 349.

Case, Including Proposed Findings of Facts" ("*Debtor's Post-Hearing Brief*").[90]  All briefs have been submitted and the matters are ripe for determination.

## II.   CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11."  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[91]  This proceeding is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O), as it primarily concerns confirmation of Debtor's plan for reorganization and conversion from chapter 11 to chapter 7.[92]  Further, these are the type of proceedings that can only arise in the context of a bankruptcy case.[93]  There is no state law equivalent for conversion or plan confirmation.

This Court may only hear a case in which venue is proper.[94]  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending."  Debtor's Chapter 11 case is presently pending in this Court; therefore, venue of this proceeding is proper.

### B.  Constitutional authority to enter a final order

---

[90] ECF No. 351.

[91] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[92] *See* 11 U.S.C. § 157(b)(2)(A), (L), (O).

[93] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)).

[94] 28 U.S.C. § 1408.

An order converting a case from one chapter to another is considered a final order.[95]  This Court has an independent duty to evaluate whether it has the constitutional authority to sign a final order.[96]  In *Stern,* which involved a core proceeding brought by the debtor under 28 § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[97]  As indicated above, the pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O).  The ruling in *Stern* was limited to a specific type of core proceeding, one which is not implicated here.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[98]  Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2),[99] this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern,* the debtor filed a counterclaim based *solely* on state law; whereas, here, confirmation and conversion are based on express provisions of the Bankruptcy Code—§§ 11 U.S.C. 1181(a), 1191, and 1112(b)(4)(A), (B), and (F)—and judicially-created bankruptcy law interpreting those provisions. This Court is therefore constitutionally authorized to enter a final order on the Motion to Convert and confirmation.

---

[95] *In re Gow Ming Chao*, No. 11-38131, 2011 Bankr. LEXIS 4543, at *7 (Bankr. S.D. Tex. 2011) (citing *In re Yehud-Monosson USA, Inc.*, Case No. 11-6040, 458 B.R. 750, 2011 Bankr. LEXIS 3725, 2011 WL 4578448, at *1 (B.A.P. 8th Cir. Oct. 5, 2011)).

[96] *Stern v. Marshall*, 564 U.S. 462 (2011).  *But see Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 668–69 (2015) (holding that parties may consent to jurisdiction on non-core matters).

[97] 564 U.S. at 503.

[98] *See, e.g.*, *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . . We decline to extend *Stern*'s limited holding herein.") (citing *Stern*, 564 U.S. at 475, 503).

[99] *See First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . .").

### III.   Analysis

To resolve the pending matters, the Court considers, in addition to all the evidence in the record, arguments of counsel and applicable law, (A) the credibility of the witnesses who testified at the November 29, 2021 hearing; (B) whether the Subchapter V Trustee fulfilled her statutory duties in this case; (C) the UST's Motion to Convert[100] along with Chowdary's Joinder; (D) whether this case should be converted to chapter 7 or dismissed if cause is found; (E) whether Debtor should remain in possession or be removed; and (F) whether this Court should refer this case to the United States Attorney for potential crimes under title 18 of the United States Code. The Court considers each in turn.

### A. Credibility of Witnesses

In its findings below, this Court details many of the ways in which Dr. Ozcelebi has shown himself untrustworthy.   In each of the hearings relevant here, Dr. Ozcelebi had selective amnesia, often testifying that he could not remember or did not know until he was shown proof that he previously testified about the same matter or produced documentary evidence related to the matter, after which he would suddenly remember details.

Dr. Ozcelebi is a highly educated man, a medical doctor in fact, and as the evidence will bear out, is involved in numerous business ventures, including opening and operating both the

---

[100] Section 1112 of the Bankruptcy Code states:

> The Court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

11 U.S.C. § 1112(b)(3). In the instant case, the Motion of the United States Trustee to Convert Case was filed on December 6, 2021, and heard on January 5, 2022, meeting the initial 30-day requirement.  Nevertheless, this Memorandum Opinion is being issued after the 15-day deadline due to compelling circumstances that prevented this Court from meeting the deadline.  Those circumstances include consideration of the numerous matters pending before this Court such as a contested confirmation and dismissal, conversion, or potential removal of the debtor in possession under § 1185(a), which is a first impression for this Court, the voluminous evidence presented by the parties in this case, including hundreds of pages of transcripts, and post-hearing briefing ordered by the Court.

Clinic and the Endoscopy Center and dealing in real estate.  Debtor even disclosed that he evaluated a new business venture for a friend and advised that friend on such venture.[101]  Mrs. Ozcelebi also testified that her husband, Dr. Ozcelebi discusses investments, to include real estate opportunities and stocks, and business aspects with his brother, Cengiz Ozcelebi, all the time.[102]

 Yet, Dr. Ozcelebi repeatedly feigned ignorance and passed blame, apparently knowing little to nothing about his finances, his financial reports, his wife's spending habits, or his adult children's rather handsome living expenses that he and Mrs. Ozcelebi have been underwriting and managing for the last several years.  Many of Dr. Ozcelebi's answers were essentially "ask someone else."  That "someone else" was his accountant, Mrs. Ozcelebi, his attorneys, or the trustees of the Trusts.  Dr. Ozcelebi frequently qualified his answers with an "I think" or a "but I'm not sure" or otherwise avoided answering questions directly.  Dr. Ozcelebi's evasiveness betrayed the fact that, indeed, he had something to hide.  While the cold transcripts reveal that Dr. Ozcelebi was dishonest, they could never fully convey his evasive demeanor and lack of credibility.

 On the other hand, the Court found two other witnesses, Mrs. Ozcelebi and Catherine Curtis, the subchapter V trustee, credible.  Both Mrs. Ozcelebi and Catherine Curtis contradicted Dr. Ozcelebi on key points.  For example, Dr. Ozcelebi testified that he was unaware disbursements were being made from the Trusts for his children's expenses.[103]  In direct contradiction, Mrs. Ozcelebi testified that she informs Debtor when she makes requests to the Trusts for the children's expenses.[104]  As another example, Debtor testified that $5,000 went to Catherine Curtis for her subchapter V trustee fees, later testifying that he thinks she got paid, and later testifying that he

---

[101] ECF No. 354 at 7.
[102] ECF No. 108 at 63:17–64:5.
[103] ECF No. 340 at 27:8–28:2.
[104] *Id.* at 96:13–24.

didn't remember if or when she got paid.[105]   Catherine Curtis testified that she was expecting payment from Dr. Ozcelebi in October but was never paid.[106]

There were two other witnesses, William Skrobarczyk, M.B.A., C.P.A., P.F.S. and K.V. Chowdary, M.D., whom the Court found credible, but whose testimony does not play a part in the findings below.

**B.  Subchapter V Trustee's duties under § 1183(b)(2)**

Section 1183 provides that a subchapter V trustee shall be appointed in each subchapter V case, whether that trustee is a standing trustee, a disinterested person appointed by the United States trustee, or the United States trustee itself.[107]   The subchapter V trustee, tasked primarily with facilitating consensual plans, occupies a unique position as contrasted with its counterparts in traditional chapter 11 and other cases, who tend to be adversarial to the debtor by virtue of their duties to protect the bankruptcy estate and its creditors.   The subchapter V trustee's special duty to "facilitate the development of a consensual plan of reorganization"[108] appears nowhere else in the Bankruptcy Code and is specific to subchapter V.   Chapter 7 trustees marshal and administer estate assets to pay creditors. Chapter 11 trustees take possession of estate assets and facilitate either a liquidation or a reorganization. Chapter 13 trustees gather assets in the form of plan payments for distribution to creditors. Chapter 12 trustees are perhaps the closest to subchapter V trustees because they occupy a similar role as overseer without taking possession of estate property unless directed to do so in the administration of a confirmed chapter 12 plan of reorganization.

---

[105] *Id.* at 44:6–47:2.
[106] *Id.* at 82:20–84:5.
[107] 11 U.S.C. § 1183.
[108] *Id.* § 1183(b)(7).

Unlike their counterparts in other chapters, subchapter V trustees do not take possession of estate property unless the debtor is removed[109] or the trustee is directed to do so under a plan confirmed under § 1194(b)[110] and subchapter V trustees are not required to investigate the debtor's financial affairs unless the court orders it for cause.[111]  The subchapter V trustee's statutory duties are enumerated in § 1183(b).  Subsections 1183(b)(1), (3), (4), (6), and (7) are to be performed by the subchapter V trustee in every case.[112]  In addition to facilitating the development of a consensual plan, the subchapter v trustee must (a) appear and be heard at the status conference [113] and at any hearing concerning (i) the value of property subject to a lien, (ii) confirmation of a plan, (iii) modification of a plan after confirmation, and (iv) the sale of property of the estate.[114]  The responsibility of the subchapter V trustee to participate in the plan process and to be heard on plan and other matters cloaks the subchapter V trustee with the statutory right to obtain information about the debtor's property, business, and financial condition.

The duties outlined in § 1183(b)(5) are performed by the subchapter V trustee only in the event the debtor ceases to be the debtor-in-possession.  Section 1183(b)(2) provides that the subchapter V trustee shall "perform the duties specified in paragraphs (3), (4), and (7) of section 1106(a) of [title 11], *if the court for cause and on request of a party in interest, the trustee, or the United States trustee, so orders*."[115]  Pertinent here, § 1106(a) provides:

A trustee shall—

(3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's

---

[109] *Id.* § 1183(b)(5).

[110] *Id.* § 1194(b).

[111] *Id.* § 1183(b)(2).

[112] *Id.* § 1183; *see also* COLLIER ON BANKRUPTCY ¶ 1183.03[1] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[113] 11 U.S.C. § 1188(a).

[114] *Id.* § 1183(b)(3).

[115] Emphasis added.

business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(4) as soon as practicable—

> (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; . . . .

This case is rife with complaints from Dr. Chowdary, the United States Trustee, and the Subchapter V Trustee about Debtor's true financial condition and his management of the estate as debtor-in-possession. For example, the Subchapter V Trustee's Notice complains about, inter alia, (1) the Amended Plan's lack of clarity on how much creditors can expect to be paid under the Plan, how much income will be used to fund the Plan, and what those sources of income are; (2) Debtor's good faith as it relates to his salary level and disposable income; (3) the value of Debtor's beneficial interest in the Trusts' income stream; and (4) Debtor's business interests reported on the Texas Secretary of State website, the ownership interests of Vega and Solano, and how income flows to Debtor through those entities, if any.[116] The UST and Dr. Chowdary raise many of the same complaints, namely the value of Debtor's beneficial interest in the Trusts, the good-faith nature of Debtor's proposed salary, the value of Debtor's community interest in Mrs. Ozcelebi's membership interests in Mission Business Management LLC and Faith Ozcelebi Management LLC, and whether post-petition trust distributions to and on behalf of Mrs. Ozcelebi and Debtor's three adult children constitute property of the estate.[117]

---

[116] ECF No. 278 at 1–3, ¶¶ 2(a), (d), (l). Record evidence and Debtor's testimony establishes that Debtor is manager of Fatih Management, president of Solano Land LLC, president of Endoscopy Center at Ridge Plaza Management, LLC, manager and president of the Clinic, and manager of McAllen Business. ECF Nos. 281-33, 281-57 at 2, 281-57, 281-58, 281-89, 286-2 286-3, 290 at 109:21–110:6. And, as indicated in the Subchapter V Trustee's Notice, Debtor may have additional business connections not brought to light by the parties in interest. ECF No. 278 at 3 n.1.

[117] *See* ECF Nos. 277, 279.

Dr. Chowdary, the Subchapter V Trustee, and the UST repeatedly complained about Debtor's financials, expressly had the power of § 1183(b)(2) at their fingertips, and yet none of them ever sought an order from this Court requiring the Subchapter V Trustee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the case or to the formulation of a plan."[118]  Their failure to utilize the tool fashioned by Congress expressly for use by them—a party in interest, the subchapter V trustee, and the United States Trustee—has resulted in prolonged litigation with no resolve.  Parties should always use the tools provided by the Code to mitigate waste of judicial resources.  That was not done here.

## C.  United States Trustee's Motion to Convert and Dr. Chowdary's Joinder[119]

The UST alleges generally that cause exists to convert this case to chapter 7 pursuant to § 1112(b) for "Debtor's lack of good faith in filing the Plan, combined with the failure to account for post-petition trust distributions and expenses."[120]  More specifically, the UST seeks conversion on three statutory grounds: § 1112(b)(4)(A), (B), and (F).

Section 1112(b)(1) states that the court *shall* dismiss or convert a chapter 11 case for cause, whichever is in the best interest of creditors and the estate, unless the court determines that the appointment of a trustee or an examiner under § 1104 is in the best interests of the estate.[121]  Because § 1104 does not apply in a subchapter V case,[122] this Court has no power to appoint a chapter

---

[118] 11 U.S.C. § 1106(a)(3).

[119] With respect to conversion, Dr. Chowdary's Joinder states that "[f]or all the reasons stead in the Motion [to Convert], this case should be converted to Chapter 7.  ECF No. 321 at 1, ¶ 1.  The Joinder makes no additional allegations or arguments.  Therefore, this Court solely refers to the UST's Motion to Convert and arguments in this section.  Dr. Chowdary's Joinder additionally asks this Court to "consider in its decision on the Motion all evidence and testimony previously admitted in the multiple hearings on confirmation of the Debtor's proposed plans."  *Id.* ¶ 2.  This Court will do so.

[120] ECF No. 296 at 3, ¶ 10.

[121] 11 U.S.C. § 1112(b)(1).

[122] *Id.* § 1181(a) (stating that 11 U.S.C. § 1104 does not apply in a case under subchapter V).

11 trustee or an examiner in this case.  Therefore, this Court is restricted to converting or dismissing this case under § 1112(b).

The Code defines "cause" for purposes of § 1112(b) with a non-exhaustive enumerated list including, in pertinent part: substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, gross mismanagement of the estate, and unexcused failure to satisfy timely any filing or reporting requirement established by title 11 or by any rule applicable to a case under chapter 11.[123]  Additionally, although not specifically enumerated, bad-faith conduct also constitutes cause to convert or dismiss a case.[124]  Regardless of the basis for cause, "inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor."[125]

The UST, as the party seeking conversion, bears the burden of proving cause by a preponderance of the evidence.[126]  Even if this Court finds cause, however, this Court must abstain from converting the case to chapter 7 if "the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" and the debtor or another party in interest establishes: (1) that there is  a reasonable likelihood of plan confirmation; and (2) that the grounds for converting or dismissing the case include an act or omission of the debtor other than under § 1112(b)(4)(A).[127]

### 1.  Whether cause exists to convert under § 1112(b)(4)(A)

---

[123] *Id.* §§ 1112(b)(4)(A)–(B), (F).  *See also In re TMT Procurement Corp.*, 534 B.R. 912, 917 (Bankr. S.D. Tex. 2015) ("Section 1112(b)(4) contains a non-exhaustive list of examples of cause meriting conversion or dismissal.").

[124] *See, e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071–72 (5th Cir. 1986) ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."); *In re Zamora-Quezada*, 622 B.R. 865, 879–80 (Bankr. S.D. Tex. 2017) ("Whilst [§ 1112(b)] does not specify bad-faith conduct as 'cause' for conversion or dismissal, '[b]ankruptcy courts nevertheless routinely treat dismissal for . . . bad-faith conduct as implicitly authorized by the words for cause.'") (quoting *Marrama v. Citizens Bank*, 549 U.S. 365, n.1, 373 (2007)).

[125] *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 371–72 (5th Cir. 1987).

[126]  *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.1994).

[127] 11 U.S.C. § 1112(b)(2).

To demonstrate cause pursuant to § 1112(b)(4)(A), the moving party must show that there is both (1) a substantial or continuing loss to or diminution of the estate *and* (2) the absence of a reasonable likelihood of rehabilitation.[128]   The loss may be substantial or continuing; it need not be both.[129]   If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial.[130]

### Substantial or continuing loss to or diminution of the estate

When examining the movant's evidence for loss or diminution, "courts must look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate."[131] The situation presented to the court may be tolerable under the circumstances, but the loss or diminution "should not continue . . . beyond the point at which reorganization no longer remains realistic."[132]   The alleged loss can either be "sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of the creditors" or can be an ongoing issue, such as negative cash flow.[133]

The UST alleges that "throughout the pendency of this bankruptcy proceeding, Debtor has received distributions from various trusts in the form of direct payments to third parties to cover Debtor's expenses."[134]   The UST further alleges that "Debtor's non-filing spouse has received post-petition trust distributions—community property that is property of the bankruptcy estate."[135]

---

[128] *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013).
[129] *Id.* ("The loss may be substantial or continuing.  It need not be both in order to constitute cause under § 1112(b)(4)(A).") (citing COLLIER ¶ 1112.04[6][a][i]).
[130] COLLIER ¶ 1112.04[6][a][i].
[131] 5 Norton Bankr. L. & Prac. 3d § 103:7 (2022).
[132] *Id.*
[133] *In re TMT Procurement*, 534 B.R. at 918; *see also In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D. N.C. 2014); *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009).
[134] ECF No. 296 at 3, ¶ 6.
[135] *Id.* ¶ 7.

In support, the UST cites Debtor's First Plan Supplement, which discloses about $249,000 in distributions and loans from Lyra and Vega for Debtor's children's living expenses, payment of Mrs. Ozcelebi's American Express credit card, and other expenses in 2021.[136]  The UST also cites the "Supplement to Declaration of Jarrod B. Martin Pursuant to 11 U.S.C. § 327 and Bankruptcy Rules 2014 and 2016" ("*Counsel's Declaration Supplement*"), which discloses a $116,600.78 payment to Debtor's attorneys, Chamberlain, Hrdlicka, White, Williams & Aughtry ("*Chamberlain*"), from Lyra on October 29, 2021.[137]  "Without the likelihood of a confirmed plan on the horizon and the continued depletion of the bankruptcy estate," the UST concludes, "conversion is warranted under section 1112(b)(4)(A)."[138]

Whether the distributions and loans made from Lyra and Vega constitute "substantial or continuing loss to or diminution of the *estate*" depends on whether the funds disbursed to third parties are property of Debtor's bankruptcy estate pursuant to § 1186.[139]  Debtor's schedules identify the Trusts as spendthrift trusts.[140]  "In general, a spendthrift trust is one in which the right of the beneficiary to future payments of income or capital cannot be voluntarily transferred by the beneficiary or reached by his or her creditors."[141]  Under § 541(c)(2), incorporated here by § 1186,[142] the property of a spendthrift trust is not property of the estate if state law protects those assets from a beneficiary's creditors.[143]  Texas law protects spendthrift trust property from a beneficiary's creditors unless "the settlor is also a beneficiary of the trust."[144]

---

[136] *Id.* ¶ 6 (citing ECF No. 265 at 6–13).

[137] *Id.* ¶ 6 (citing ECF No. 264).

[138] *Id.* at 6, ¶ 21 (citing *In re Featherworks Corp.*, 45 B.R. 455 (Bankr. E.D.N.Y. 1984).

[139] 11 U.S.C. § 1112(b)(4)(A) (emphasis added).

[140] ECF No. 255 at 6.

[141] *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 428 (5th Cir. 2007) (quoting *In the Matter of Shearn Moody, Jr. (In re Moody)*, 837 F.2d 719, 723 (5th Cir. 1988)).

[142] 11 U.S.C. § 1186 provides, "[i]f a plan is confirmed under section 1191(b) of this title, property of the estate includes, in addition to the property specified in section 541 of this title . . . ."

[143] *In re Bradley*, 501 F.3d at 428.

[144] *Id.* (quoting TEX. PROP. CODE § 112.035(d)).

Nevertheless, "the income payments from a spendthrift trust which the beneficiary is entitled to receive or does receive within the 180 day period after the filing of the bankruptcy petition are brought into the bankruptcy estate."[145]   In relevant part, the Trust Agreements provide:

A.   The Trustees shall distribute, at least annually, in equal shares among the beneficiaries of the trust all or any part of the net income of the trust for the comfort, support, education, maintenance, health and welfare of the beneficiaries.

. . .

In addition to the authority and discretion granted above, the Trustees shall determine the taxable income of the trust and, the Trustees, in his sole discretion, may distribute at any time prior to the expiration of sixty-five (65) days following the end of each taxable year of the trust, all or any portion of any taxable income so determined, to one or more income beneficiaries of the trust, if such action appears desirable in the light of the overall tax situation of the trust and the beneficiaries.   Any income of the trust not distributed by the Trustees shall be added to principal and retained in the trust.

B.   In addition to the net income, if in the sole and absolute discretion of the Trustees, circumstances have arisen which make it desirable for the comfort, support, education, maintenance, health and welfare of any beneficiary, the Trustees shall distribute to, or for the benefit of, any such beneficiary of the trust (or to the surviving children of a deceased beneficiary) such amount or amounts of principal from the trust as the Trustees determine proper.[146]

Under the terms of the Trust Agreements, the only income that beneficiaries are entitled to is equal shares of the Trusts' net income, disbursed at least once per year.   The beneficiaries are not entitled to taxable income of the Trusts or the Trusts' principal.   The UST offered no evidence establishing that the Trusts had any net income post-bankruptcy.   Additionally, the UST failed to demonstrate that the "at least annually" language of Article II(A) required distribution within 180 days of Debtor filing his petition.

---

[145] *In re Moody*, 837 F.2d at 723 (citing 11 U.S.C. § 541(a)(5)(A)).
[146] ECF Nos. 286-4, 286-5, 286-6.

Moreover, although disbursements were made from Lyra and Vega within the 180-day period,[147] the question is whether those disbursements, specifically those made for Debtor's adult children's expenses, were "received" by Debtor.  Despite Debtor's Schedule I, which indicates that Debtor received $10,365.40 in monthly trust disbursements at the time he filed bankruptcy,[148] according to Debtor, he has not received any post-petition disbursements.[149]  However, Debtor's adult children as secondary beneficiaries with a vested remainder are not entitled to disbursements until both Debtor and Mrs. Ozcelebi are deceased.[150]  Therefore, the disbursements made to cover the adult children's expenses are made on behalf of Debtor, Mrs. Ozcelebi, or both.  If any of those expenses were covered by net income, then they were made on behalf of both Debtor and Mrs. Ozcelebi and 50% of such disbursements belonged to Debtor and became property of the estate once disbursed.  If, on the other hand, those disbursements were covered by taxable income or principal, it's possible they were made solely on behalf of Mrs. Ozcelebi because the Trust Agreements do not require taxable income or principal to be distributed equally among beneficiaries.  If the latter, then those disbursements were not "received" by Debtor within 180 days of filing for bankruptcy.

The UST's ultimate failure to carry its evidentiary burden leaves this Court unable to conclude that Debtor was entitled to receive or received disbursements within 180 days of filing his bankruptcy petition.  However, this Court finds that to the extent any disbursements made by the Trusts from October 16, 2020 to April 14, 2021 were net income of the Trusts, 50% of such

---

[147] ECF No. 265 at 6–13.
[148] ECF No. 35 at 19.
[149] ECF No. 285 at 2, ¶ 4.
[150] ECF Nos. 286-4, 286-5, 286-6.

disbursements belonged to Debtor and thus were property of the estate pursuant to *In re Moody* and Texas law.[151]

The UST also asserts that the Trusts' disbursements to Mrs. Ozcelebi (or American Express on her behalf) constitute community property and therefore, property of the bankruptcy estate pursuant to § 541(a)(2) and § 1186(a).[152]   Section 541(a)(2)(B) provides that "all interests of the debtor and the debtor's spouse in community property as of the commencement of the case *that is liable for an allowable claim against the debtor*" is property of the estate.

Texas law defines community property as "property, other than separate property, acquired by either spouse during marriage."[153]   Community property under Texas law is further subdivided into jointly and solely managed community property.[154]   "Ordinarily, Texas law does not allow the creditor of one spouse to garnish the non-debtor spouse's solely managed community property."[155]   Solely managed community property includes personal earnings, revenue from separate property, recoveries for personal injuries, and the increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control, and disposition.[156]

If the Trusts' disbursements to Mrs. Ozcelebi and American Express constitute solely managed community property, then they are not property of the estate under § 541(a)(2)(B) because they are not "liable for an allowable claim against the debtor" according to state law.   The UST argues that because Mrs. Ozcelebi and Debtor are both beneficiaries of the Trusts, the Trusts' disbursements to Mrs. Ozcelebi are not personal earnings, revenue from separate property, nor recoveries for personal injuries and thus, not solely managed community property.[157]   The UST's

---

[151] *See In re Moody*, 837 F.2d at 723.
[152] ECF No. 349 at 18, ¶ 71.
[153] TEX. FAM. CODE § 3.002.
[154] *United States v. Elashi*, 789 F.3d 547, 549 (5th Cir. 2015).
[155] *Elashi*, 789 F.3d at 549 (citing TEX. FAM. CODE § 3.202(b)).
[156] TEX. FAM. CODE § 3.102(a).
[157] ECF No. 349 at 19, ¶ 73.

argument fails to address the intricacies of the separate/community nature of trust distributions under Texas law.

Under Texas law, "in the context of a distribution of trust income under an irrevocable trust during marriage, income distributions are community property only if the recipient has a present possessory right to part of the corpus, even if the recipient has not chosen to exercise that right, because the recipient's possessory right to access the corpus means that the recipient is effectively an owner of the trust corpus."[158]  The UST failed to cite any evidence demonstrating that Mrs. Ozcelebi has a present possessory right to part of the corpus of the Trusts.  The UST didn't even bother to cite to the Trust Agreements themselves.  This Court cannot conclude that the distributions made to Mrs. Ozcelebi from the Trusts were community property and thus property of the estate under § 1186.

Accordingly, the UST has not satisfied its burden to demonstrate by a preponderance of evidence that there has been a substantial or continuing loss to the estate or diminution in value of the estate, and thus, has not satisfied the first prong of § 1112(b)(4)(A).  Therefore, this Court need not analyze the second prong of § 1112(b)(4)(A).

## 2.  Whether cause exists to convert pursuant to § 1112(b)(4)(B)

Section 1112(b)(4)(B) provides that gross mismanagement of the estate is cause for dismissal or conversion.[159]  Analysis under § 1112(b)(4)(B) focuses solely on the management of the estate and does not include mismanagement of the pre-petition debtor.[160]  Therefore, the Court considers only the post-petition conduct of Debtor as debtor-in-possession.

---

[158] *Sharma v. Routh*, 302 S.W.3d 355, 364 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  *See also Lacey v. Askanase (In re Lacey)*, 1994 U.S. App. LEXIS 42650, at *2–3 (5th Cir. 1994) (citing *In re Marriage of Long*, 542 S.W.2d 712, 718–19 (Tex. Civ. App.—Texarkana 1976, no writ)).
[159] 11 U.S.C. § 1112(b)(4)(B).
[160] *In re Zamora-Quezada*, 622 B.R. at 886 (citing *In re Briggs-Cockerham, L.L.C.*, 2010 WL 4866874, at *4 (Bankr. N.D. Tex. Nov. 23, 2010)).

A debtor-in-possession is vested with significant power under the Bankruptcy Code and that power comes with certain responsibilities.[161]  A debtor-in-possession owes a fiduciary duty to its creditors.[162]  Gross mismanagement of the estate is a breach of that duty.  And while "gross mismanagement" is not defined by the Bankruptcy Code, Black's Law Dictionary defines "gross" as "beyond all reasonable measure; flagrant."[163]  Given the plain language, a debtor's mismanagement must be beyond all reasonable measure.[164]  The UST cites two cases in support of its assertion that Debtor grossly mismanaged the estate: *In re Visicon Shareholders Trust*, 478 B.R. 292 (Bankr. S.D. Ohio 2012), and *In re 210 West Liberty Holdings, LLC*, No. 08-677, 2009 Bankr. LEXIS 1706 (Bankr. N.D. W. Va. May 29, 2009).

A variety of conduct can establish gross mismanagement.[165]  In *Visicon*, the court found that the debtor grossly mismanaged the estate because the debtor used the estate's cash to pay the personal expenses of insiders and pre-petition unsecured creditors, and to make costly renovations to the debtor's business.[166]  In *210 West Liberty*, the court found that the debtor engaged in gross mismanagement because the debtor made no attempt to collect a rent obligation owing to it and provided no compelling reason why the debtor was not pursuing the estate asset; received money from third parties to pay the debtor's expenses without timely disclosure to the court and parties in interest or without seeking approval of the court for engaging in some form of post-petition

---

[161] *In re Haydel Props., LP*, No. 12-50048, 2013 Bankr. LEXIS 5782, at *11–12 (Bankr. S.D. Miss. Mar. 11, 2013) (citing Collier ¶ 1112.04[6][b] (quoting *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007)).

[162] *In re Ironside, LLC*, No. 20-34222, 2022 Bankr. LEXIS 409, at *4 (Bankr. S.D. Tex. Feb. 18, 2022).

[163] Black's Law Dictionary, *gross* (11th ed. 2019).

[164] *See also In re 210 W. Liberty Holdings, LLC*, 2009 Bankr. LEXIS 1706, at *16 (noting that § 1112(b)(4)(B) requires that the mismanagement be "gross" in character meaning it is "glaringly noticeable usu[ally] because of inexcusable badness or objectionableness"); *In re Walton Street Props, LLC*, 2011 Bankr. LEXIS 5330, at *8 (Bankr. W.D. Ark. July 1, 2011) ("The 'gross mismanagement' standard implies 'that every bankruptcy reorganization involves some degree of mismanagement.'") (quoting *In re Jessen*, 82 B.R. 490, 494 (Bankr. S.D. Iowa 1988)).

[165] *In re Haydel Props., LP*, 2013 Bankr. LEXIS 5782, at *13 (quoting *In re Hoyle*, No. 10-01484-TLM, 2013 Bankr. LEXIS 420, at *40 (Bankr. D. Idaho Jan. 17, 2013)).

[166] 478 B.R. at 309–10.

financing, if the money received was indeed a loan rather than a gift; and failed to remedy fire code violations that threated the loss of the debtor's occupancy permit.[167]  In *Wallace*, No. 09-20496-TLM, 2010 Bankr. LEXIS 261, at *16–19 (Bankr. D. Idaho Jan. 26, 2010), the court found that the debtors compensated professionals out of the debtor-in-possession's account without first seeking court approval, obtained post-petition financing without court approval, and paid pre-petition credit card debt.  Those actions, in conjunction with the debtors' inadequate financial report and conduct falling under § 1112(b)(4)(A), constituted gross mismanagement of the estate.[168]  In *In re Fall*, 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009), the court found that the debtor grossly mismanaged the estate where the debtor used cash collateral without court authority, failed to maximize estate assets, in part by failing to pursue its accounts receivable, and failed to provide the court with an accurate financial picture of the debtor-in-possession.  The Court considers whether Debtor's conduct here rises to the level of gross mismanagement, like the debtors in the abovementioned cases.

First, in *Visicon* and *Wallace*, part of the debtors' problematic conduct was the use of *estate* funds to pay insiders, pre-petition unsecured creditors, and professionals.  Here, the UST complains that "Debtor failed to disclose in his monthly operating reports that the Trusts were making payments on his behalf, and that his non-filing spouse received post-petition trust distributions."[169]  In support, the UST points to Debtor's First Plan Supplement reflecting disbursements from Lyra and Vega (1) for Debtor's children's expenses (2) to American Express for Mrs. Ozcelebi's credit card; and (3) directly to Mrs. Ozcelebi.[170]  The UST also points to Counsel's Declaration

---

[167] *In re 210 W. Liberty*, 2009 Bankr. LEXIS 1706, at *16–18.
[168] *In re Wallace*, 2010 Bankr. LEXIS 261, at *19.
[169] ECF No. 296 at 3, ¶ 8.
[170] ECF No. 265.

Supplement reflecting a payment of $116,600.78 from Lyra to Chamberlain for Debtor's legal fees.[171]  As thoroughly discussed above, the UST failed to establish that the disbursements from Lyra and Vega are property of the estate pursuant to § 1186.  Thus, even if the disbursements were made to insiders, professionals, and pre-petition unsecured creditors, absent a showing that those disbursements were estate funds, the Debtor's conduct here is not the same as that in *Visicon* and *Wallace*.

Second, in *Visicon*, *Wallace*, and *210 West Liberty*, the courts' findings were partially based on the debtors obtaining unapproved post-petition financing.  Pursuant to § 1184, with few exceptions, a debtor in possession has all the rights, powers, functions, and duties of a trustee serving in a chapter 11 case, including operating the business of the debtor.  Section 364 requires a trustee to seek court approval to obtain post-petition financing outside the ordinary course of business.[172]  As debtor in possession, then, Debtor is compelled by § 1184 to comply with § 364.  Federal Rule of Bankruptcy Procedure 1007(h) also requires the debtor to file a supplemental schedule in a chapter 11 reorganization case, "[i]f, as provided by § 541(a)(5) of the Code, the debtor acquires or becomes entitled to acquire any interest in property . . . ."  The UST asserts that "Debtor grossly mismanaged the estate by using over $400,000 of post-petition Trust distributions to pay for personal and family member expenses without full and timely disclosure to the Court and interested parties."[173]  As noted above, Debtor's First Plan Supplement demonstrates that both loans and distributions were made to various third parties from Lyra and Vega.[174]

As for the distributions, the UST made no attempt to prove that the distributions constitute post-petition financing.  Nor has the UST established that Debtor has a property interest in the

---

[171] ECF No. 264.
[172] 11 U.S.C. § 364(a)–(c).
[173] ECF No. 296 at 6, ¶ 22.
[174] ECF No. 265.

distributions pursuant to § 541(a)(5), which would trigger disclosure under Rule 1007(h).  Nor has

the UST cited any law requiring Debtor to disclose property in which he does not have an interest.

As for the loans, Debtor's Second Plan Supplement states that the funds loaned by Vega and Lyra

"were deposited into a bank account, solely owned and controlled by Mrs. Ozcelebi or paid directly

to American Express for a credit card in the name of Julie Ozcelebi."[175]  The UST provided no

evidence or legal support demonstrating that the loans were made to Debtor, that Debtor is liable

for repayment of such loans, or that Debtor has a property interest in loan proceeds deposited into

a bank account solely owned and controlled by Mrs. Ozcelebi.  Without more, this Court cannot

determine whether Debtor received post-petition financing without court approval like the debtors

in *Visicon*, *Wallace*, and *210 West Liberty* or whether Debtor has a property interest in the Trusts'

distributions that he was legally obligated to disclose.

 Third, The UST asserts that Debtor mismanaged the debtor-in-possession bank account by

over drafting in both August and November 2021 as reflected in Debtor's monthly operating re-

ports ("*MORs*") for those months.[176]  Debtor, the UST argues, "is supposed to receive a steady

salary from his medical practice" and "heavily relied on the Trusts to pay expenses on his behalf"

thus, "[o]ver drafting the DIP account shows mismanagement by the [sic] Dr. Ozcelebi as Debtor-

in-Possession."[177]  The UST's argument has merit.  The Court agrees that over drafting a DIP

account tends to indicate mismanagement, but § 1112(b)(4)(B) requires *gross* mismanagement.

The UST cites no authority to support a finding that over drafting a DIP account twice over the

course of 16 months in bankruptcy constitutes gross mismanagement.[178]

---

[175] ECF No. 285 at 2, ¶ 5.
[176] ECF No. 349 at 15, ¶ 59 (citing ECF Nos. 330-16 at 10, 330-19 at 11).
[177] *Id.*
[178] *Id.*

Fourth, in *Wallace* and *Fall*, the courts noted the debtors' inadequate financial reporting as a basis for finding gross mismanagement.  As detailed in the UST's Motion to Convert, a debtor-in-possession is compelled by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules, and the U.S. Trustee Guidelines for Debtors-in-Possession "to submit reports describing certain financial and case status information of debtor during the pendency of the case," including monthly operating reports.[179]  Official Form 425C, the Monthly Operating Report for Small Business Under Chapter 11, requires debtors to declare under penalty of perjury that "I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete."  The UST asserts that Debtor's MORs contain numerous misrepresentations.[180]

The UST first alleges that in September 2021, Debtor's living expenses were funded by means not disclosed in his MOR.[181]  Debtor's September 2021 MOR reflects $486.23 in disbursements and $11,620.07 in cash on hand at the end of the month.[182]  The UST cites both Debtor's Schedule J, which reflects monthly expenses of $22,775.83 and Debtor's Amended Plan, which reflects proposed monthly expenses of $4,320.15, asserting that $486.23 "is not enough to cover basic sustenance expenses under either the budget or the financial projections."[183]

As of the January 2022 Hearing, Debtor filed 13 MORs.  Excluding September 2021, the least amount of cash disbursed by Debtor in any month was $4,145.69,[184] with an average monthly cash disbursement of $9,835.65.[185]  Given those numbers, it's true that Debtor's cash disbursement

---

[179] ECF No. 296 at 5, ¶ 18 (first citing 11 U.S.C. §§ 704(a)(8), 1106(a)(1), 1107(a), then citing General Rule 2020-3, and then citing Fed. R. Bankr. P. 2015(a)(6)).
[180] ECF No. 348-9 at 11, ¶ 50.
[181] ECF No. 349 at 13, ¶ 56.
[182] ECF No. 260 at 2, ¶ 21.
[183] ECF No. 349 at 13 n.60.
[184] ECF No. 123.
[185] *See* ECF Nos. 74, 110, 123, 129, 140, 150, 158, 181, 189, 238, 317, 327.

in September 2021 was suspiciously low.  However likely it is that Debtor's September 2021 expenses were funded from another undisclosed source, no evidence of that source was presented to the Court and therefore, all that can be concluded is that the September 2021 MOR raises suspicion.

The UST also points out numerous inaccuracies in Debtor's MORs.  For example, Debtor's First Plan Supplement reflects a $7,000 contribution from Lyra to Debtor's IRA on December 31, 2020.[186]  This contribution is absent from Debtor's December 2020 MOR and was not disclosed as a payment made on his behalf as required by Official Form 425C, question 15.[187]  Debtor also failed to disclose payment of professional fees.  Official Form 425C, question 29 asks: "How much have you paid in professional fees related to this bankruptcy case since the case was filed?"  Despite reporting a payment of $2,362.85 to Chamberlain on his March 2021 MOR,[188] Debtor failed to report that amount on any subsequent MORs.[189]  Debtor also failed to report a payment to Chamberlain of $134,297.69 made October 29, 2021, in response to question 29 on both his October 2021 and November 2021 MORs.[190]  Only after Debtor was questioned about his failure to disclose that payment[191] did he file an amended October 2021 MOR, listing the payment in Exhibit B as a payment made on his behalf.[192]  The UST notes that the $134,297.69 reported by Debtor differs from the $116,600.78 reported in Counsel's Declaration Supplement.  When questioned, Debtor was not sure which amount was correct.[193]  Debtor also failed to disclose unpaid bills for

---

[186] ECF No. 265 at 6; *see also* ECF No. 290 at 120:18–121:13.
[187] ECF No. 110.
[188] ECF No. 140.
[189] ECF Nos. 150, 158, 181, 189, 238, 260, 268, 317, 327.
[190] ECF Nos. 317, 327.
[191] ECF No. 290 at 121:24–122:7.
[192] ECF No. 327.
[193] ECF No. 340 at 40:24–41:5.

the Subchapter V Trustee's fees and for Chamberlain's fees that should have been disclosed in response to question 24 beginning with the May 2021 MOR and July 2021 MOR, respectively.[194]

Perhaps most egregiously, Exhibit D and the Reconciliation Detail of Debtor's amended October 2021 MOR reflect a payment of $5,000 to "Catherine Curtis Trustee" for "Legal Fees" on October 13, 2021.[195]  The check number associated with that payment is 1100.[196]  Exhibit D also contains a copy of check number 1100, which is made out to Fatih Ozcelebi in the amount of $5,000 for "Expenses Sept 2021" and signed by Debtor himself and reflects that the check cleared the bank.[197]

Debtor testified that he paid check 1100 to himself, not the Subchapter V Trustee; then followed up with "I don't remember what happened with this check and then it went to Catherine Curtis."[198]  When asked if he paid any fees to the Subchapter V Trustee, Debtor testified, "I think she gets paid.  I don't remember that either.  I think she got paid."[199]  A few seconds later Debtor stated, "I don't remember if she got paid or when she got paid."[200]  Debtor also testified that although it was his handwriting on the check, he couldn't remember whether he cashed the check but admitted that he has written checks to himself from his DIP account and then cashed them at Texas Regional Bank.[201]  At the January 2022 Hearing, the Subchapter V Trustee credibly testified that she has not received any payments from Debtor toward her fees as trustee.[202]  The Subchapter V

---

[194] *See* ECF Nos. 158, 181, 189, 238, 260, 317, 327.  On May 15, 2021, this Court entered an Order Granting Interim Compensation to Catherine Curtis, Subchapter V Trustee in the amount of $5,250.  ECF No. 148.  On July 20, this Court entered an Order Granting Interim Compensation and Expenses in the amount of $188,358.11 in favor of Chamberlain. ECF No. 180.
[195] ECF No. 327 at 7, 21.
[196] *Id.*
[197] *Id.* at 10–11.
[198] ECF No. 340 at 44:6–14.
[199] *Id.* at 46:13–16.
[200] *Id.* at 46:17–47:2.
[201] *Id.* at 60:20–62:3.
[202] *Id.* at 82:20–83:4.

Trustee further testified that she was expecting a check from Debtor around October, but never received one.[203]

Debtor attempts to absolve himself of any wrongdoing as debtor-in-possession by repeatedly blaming his accountant and attorneys for the mistakes in his MORs, testifying that he relied on them to fill out the monthly operating reports and they made mistakes.[204]   Debtor's Post-Hearing Brief argues that given the voluminous amount of documents Debtor's accountant prepared and "the fact that the top left of the check number 1100 has both Debtor's name and the [Subchapter V] Trustee's name on it, it is reasonable to infer that the Debtor's Accountant simply incorrectly identified such items on the MORs."   The Court declines to make such an inference absent any evidence whatsoever to that effect.   The Court will not speculate as to what Debtor's accountant may or may not have been mistaken about.   Moreover, despite his attempted scapegoating, Debtor also testified that although his accountant and attorneys prepare the monthly operating reports, he reviews and signs them and that he corrects "as many mistakes or anything that can be corrected" before filing the reports.[205]

Debtor swore to and affixed his signature on all 13 MORs, certifying, that he reviewed the reports and any accompanying documents, it was not Chamberlain or the accountant's signature that appeared on the MORs.[206]   Debtor's reliance defense is undermined by his admission that he

---

[203] *Id.* at 83:24–84:5.
[204] *Id.* at 23:4–7 ("I get help from the professionals and this is the way they recommended me to fill out this form."), 30:5–23 ("I have to tell my professionals to be more careful about these things."), 33:6–8 ("It looks like Jarrod Martin or the accountant made a mistake and you found it."), 35:5–7 ("I didn't know it was supposed to be over there and I'm getting help from the professionals to fill this paper out."), 60:5–18 (testifying that Debtor's accountant and his attorney prepare the monthly operating reports and that Debtor doesn't "review it line-by-line, just look at the whole report like this.  [He] doesn't go line-by-line and check out every single item."), 73:12–19 ("Yes, my professionals prepare it and I trust their judgment as much as they can.").
[205] *Id.* at 60:5–18, 73:12–74:16.
[206] *E.g.*, ECF No. 140.

reviewed, corrected, and signed his MORs.[207]  And, as stated by the Supreme Court in *Link*, "each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney."[208]  By choosing Chamberlain to represent him, Debtor "agreed to be bound by [Chamberlain's] actions and inactions."[209]  Debtor's reliance on his counsel and his accountant do not relieve him of the diligence required to ensure the Court that his sworn statements remain true.[210]  Thus, even if true that the mistakes and misrepresentations in Debtor's MORs were the fault of Chamberlain or Debtor's accountant, the truth and accuracy of Debtor's MORs are Debtor's responsibility alone.

Debtor lastly attempts to absolve himself by arguing that the "Supplement to Declaration of Jarrod B. Martin Pursuant to 11 U.S.C. § 327 and Bankruptcy Rules 2014 and 2016," ("*Counsel's Second Declaration Supplement*") "clarified the amount of monies paid to the [Subchapter V] Trustee."[211]  Counsel's Second Declaration Supplement states that $5,250.00 in fees and $57.05 in expenses was paid to the Subchapter V Trustee on January 20, 2022 by Chamberlain from the $17,696.91 that was refunded by Chamberlain for non-bankruptcy work that was charged off.[212]  Payment of the Subchapter V Trustee's fees made from Chamberlain's client trust account only after the misrepresentation was revealed at the January 2022 Hearing in no way explains what happened to the $5,000 represented by check 1100 that was withdrawn from Debtor's DIP account, why it was misrepresented in Debtor's MORs, or why Debtor was so "ambivalent" about a check written from his DIP account to himself.

---

[207] *See, e.g.*, *In re Cowin*, 2014 Bankr. LEXIS 1119, at *108 (Bankr. S.D. Tex. Mar. 21, 2014); *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 374 (Bankr. S.D. Tex. 2006) ("[T]his defense is only available where the debtor's reliance was reasonable and in good faith. The reasonableness of the debtor's reliance is undermined where the debtor has admitted under oath to having read and signed the Schedules and [SOFA] . . . .") (citations omitted).
[208] *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962).
[209] *In re Gow Ming Chao*, 2011 Bankr. LEXIS 4543, at *25.
[210] *In re Walker*, 323 B.R. 188, 197 (Bankr. S.D. Tex. 2005) (citing *In re Sholdra*, 249 F.3d 380, 383 (5th Cir. 2001)).
[211] ECF No. 351 at 28, ¶ 74.
[212] ECF No. 344 at 2, ¶ 6.

In addition to check 1100, a review of the record evidence revealed that Debtor made several large cash withdrawals from his DIP account without explanation.  Between November 2020 and February 2022, Debtor wrote one other check to himself in the amount of $98.58 and made $17,600 in ATM cash withdrawals from his DIP account.[213]  Including check 1100, $22,698.58 withdrawn from Debtor's DIP account is unaccounted for.  Although the UST did not discuss these withdrawals in its Motion to Convert, they are significant in determining whether Debtor engaged in gross management in this case and this Court cannot turn a blind eye.

To fulfill one's fiduciary duties as debtor-in-possession, a debtor must "protect and conserve property in its possession for the benefit of the creditors."[214]  Unaccounted for cash withdrawals from a DIP account may constitute some evidence of a debtor's failure to protect and conserve property in its possession.  Here, Debtor's Schedule J lists monthly "allowances" in the amount of $1,200.  When questioned about this expense, Debtor testified that his "allowances" were cash money used for "groceries or any type of when I -- my credit card is not working or people want -- they don't want to take credit card so I have to pay cash."[215]  No cash allowance was listed in Debtor's Financial Projections appended to his Amended Plan.  Nevertheless, Debtor averages about $1,400 in unaccounted for cash withdrawals every month.

Debtor's testimony is problematic.  An average of $1,400 a month is a significant amount of cash allegedly spent with vendors who "don't take credit card," a rather rare occurrence in the present day in age.  Debtor's MORs regularly reflect accounting details for purchases at the grocery store HEB.  For example, Debtor's January 2021 MOR reflects about $300 in electronic debits

---

[213] ECF Nos. 74, 123, 129, 140, 150, 158, 189, 238, 350, 354, 355.
[214] *In re Cajun Elec. Power Co-op, Inc.*, 191 B.R. 659, 661 (M.D. La. 1995), *aff'd*, 74 F.3d 599 (5th Cir. 1996); *see also In re Ironside, LLC*, 2022 Bankr. LEXIS 409, at *4 ("Termed debtor-in-possession, it owes fiduciary duties to the bankruptcy estate.  Such fiduciary duties include a duty of care to protect the assets, a duty of loyalty, and a duty of impartiality.").
[215] ECF No. 223 at 79:3–11.

by HEB from Debtor's DIP account.[216]  It also reflects $1,800 in unaccounted for cash withdrawals made by Debtor at ATMs.[217]  Debtor's MORs demonstrate that Debtor typically uses his DIP account debit card to make purchases at HEB.  Therefore, the Court finds that Debtor's testimony regarding the use of cash for groceries is false and misleading.

Most problematically, however, is Debtor's statement that he uses cash when his *credit card* doesn't work or isn't accepted.  What credit card?  As detailed extensively below, Debtor testified that he cancelled his personal American Express credit card pre-bankruptcy, that he does not use Mrs. Ozcelebi's credit card, and that he uses the Clinic's American Express business credit card for gas for the company car and other expenses for the Clinic.[218]  Debtor's testimony about his use of cash is nothing more than another string in his web of lies.  Debtor's unaccounted for use of large sums of cash throughout this bankruptcy case is unacceptable.

While any one of the above enumerated errors may not alone constitute gross mismanagement, taken together, they demonstrate Debtor's gross mismanagement of the estate.  The numerous inaccuracies in Debtor's MORs, the over drafts of his DIP account, the $22,698.58 in unaccounted for cash withdrawals, the unexplained $5,000 reported as a payment to the Subchapter V Trustee, and Debtor's scapegoating and blatant lying constitute gross mismanagement of the estate.  Debtor's MORs leave this Court and all parties in interest with an inaccurate picture of Debtor's financial condition.

Accordingly, the Court finds cause to convert or dismiss Debtor's case for gross mismanagement pursuant to § 1112(b)(4)(B).

### 3.   Whether cause exists to convert pursuant to § 1112(b)(4)(F)

---

[216] ECF No. 123.
[217] *Id.*
[218] ECF No. 340 at 13:7–17:2, 56:2–17.

Pursuant to § 1112(b)(4)(F), cause also includes an "unexcused failure to satisfy timely any filing or reporting requirement established by [title 11] or by any rule applicable to a case under [chapter 11]."[219]  The UST asserts that Debtor's monthly operating reports contain material misrepresentations because he did not disclose the Trust distributions, which "are material because such monies are property of the estate used for the exclusive benefit of the Debtor," and his failure to disclose "push[ed] forward the false narrative that his income was limited to wages from his medical practice."[220]  The UST also asserts that Debtor made another material misrepresentation by failing to disclose the $116,600.78 payment to Chamberlain by Lyra.[221]  The UST concludes that because Debtor has not corrected his intentionally inaccurate operating reports, conversion pursuant to § 1112(b)(4)(F) is warranted.[222]

Despite the language of § 1112(b)(4)(F), which finds cause to convert based on untimely filing or reporting, the UST makes no complaint that the monthly operating reports were untimely. The UST's allegations and arguments center around the misrepresentations and inaccuracies in the reports.

Accordingly, the UST has not met its burden to establish by a preponderance of the evidence that cause exists to convert Debtor's case pursuant to § 1112(b)(4)(F).

**4.  Whether cause exists to convert for lack of good faith**

As this Court stated in *In re Zamora-Quezada*, "[w]hilst [§ 1112(b)(4)] does not specify bad-faith conduct as cause for conversion or dismissal, bankruptcy courts nevertheless routinely treat dismissal for bad faith conduct as implicitly authorized by the words for cause."[223]  In *Little*

---

[219] 11 U.S.C. § 1112(b)(4)(F).
[220] ECF No. 296 at 7, ¶ 24.
[221] *Id.* ¶ 25.
[222] *Id.* ¶ 26.
[223] 622 B.R. 865, 879 (Bankr. S.D. Tex. 2017) (cleaned up) (quoting *Marrama*, 549 U.S. 365, 367, n.1, 373).

*Creek*, the Fifth Circuit said that "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."[224]  The implicit good faith requirement "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without bene-fitting them in any way or to achieve reprehensible purposes."[225]  Lack of good faith findings are typically "predicated on certain recurring but non-exclusive patterns, and they are based on a con-glomerate of factors rather than any single datum."[226]  Thus, courts should employ a totality of the circumstances approach when considering a lack of good faith.  Such approach is an on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.[227]

The UST alleges that Debtor's lack of good faith in filing the plan, behavior demonstrating no intention to comply with his duties as debtor-in-possession, and concealment of information and assets while enjoying the protection of the Bankruptcy Code all serve as grounds for convert-ing this case to a chapter 7.[228]  While these general allegations suggest bad faith conduct, the UST does not highlight the plethora of acts and admissions most concerning in this case.

Nevertheless, this Court has an independent duty to consider evidence that may warrant conversion or dismissal, no matter how that evidence is brought to the Court's attention.[229]  A debtor's lack of good faith in pursuing bankruptcy relief has long been recognized as cause for

---

[224] *Id.*; *see also In re Humble Place Joint Venture*, 936 F.2d 814, 817–18 (5th Cir. 1991); H. Miles Cohn, *Good Faith and the Single-Asset Debtor*, 62 AM. BANKR. L. J. 131, 132–36 (1988).
[225] *In re Little Creek Dev. Co.*, 779 F.2d at 1071–72.
[226] 779 F.2d at 1072.
[227] *In re Zamora-Quezada*, 622 B.R. at 880.
[228] ECF No. 296 at 3, 7, ¶¶ 10, 27.
[229] *See In re Art Midwest, Inc.*, 2006 Bankr. LEXIS 12, at *9–10 (Bankr. N.D. Tex. Jan. 5, 2006) ("Finally, even if the Atlantic Parties had no standing to move to dismiss debtor's bankruptcy case pursuant to section 1112(b), the court, pursuant to section 105(a), may sua sponte dismiss a bankruptcy case filed in bad faith. *In re Bayou Self, Inc.*, 73 B.R. 682, 685 (Bankr. W.D. La. 1987). In *Little Creek*, the court instructed bankruptcy courts to be vigilant for those cases where the rehabilitative purposes of chapter 11 will not be served. 779 F.2d at 1073. This case is such a case, and this court has an independent duty to dismiss it, regardless of how the matter is brought to the court's attention.").

dismissal of the case.[230] "Good faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose."[231] This Court employs the "valid bankruptcy purpose" test to determine good faith.[232] Valid bankruptcy purposes include "preserving going concerns" and "maximizing property available to satisfy creditors."[233] Thus, a good faith petition "seek[s] to preserve or create some value that would otherwise be lost outside of bankruptcy . . . ."[234]

The primary purpose of the filing must be to reorganize or to respond to financial crisis.[235] While the Bankruptcy Code does not include an insolvency requirement for subchapter V debtor status,[236] a debtor "must, at least, face such a financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future."[237] This Court considers the totality of the circumstances to determine whether Debtor here filed his case to effect a plan of reorganization or merely as a device to serve some sinister or unworthy purpose.[238] If this Court finds cause to dismiss or convert Debtor's case, then pursuant to § 1112(b) this Court must decide whether conversion to chapter 7 or dismissal is in the best interest the estate and the creditors here.

---

[230] *In re Stephens*, 2022 Bankr. LEXIS 433, at *19–20 (Bankr. N.D. Tex. Feb. 22, 2022).

[231] *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970).

[232] *See In re Mirant Corp.*, 2005 Bankr. LEXIS 1686, at *25 (Bankr. N.D. Tex. Jan. 26, 2005) (collecting cases adopting the valid bankruptcy purpose test).

[233] *In re Roman Catholic Church of the Archdiocese of New Orleans*, 632 B.R. 593, 599 (Bankr. E.D. La. 2021) (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 Lasalle St. P'ship*, 526 U.S. 434, 453 (1999)).

[234] *Id.* (quoting *In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 39–40 (Bankr. D.P.R. 2012)).

[235] *In re Stephens*, 2022 Bankr. LEXIS 433, at *20 (Bankr. N.D. Tex. Feb. 22, 2022) (citing *Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, 431 F. App'x. 272, 275 (5th Cir. 2011)). *But cf. Gremillion v. HealthEdge Inv. Fund, LP (In re Gremillion)*, 547 B.R. 196, 201 (Bankr. E.D. La. 2016) ("To dismiss a bankruptcy petition as a bad faith filing requires findings of both objective and subjective bad faith in filing the petition. The movant bears the burden of proving that the filing was frivolous because there was no reasonable probability that the debtor would emerge from the bankruptcy proceeding because there is no realistic chance of reorganizing.") (internal quotation marks omitted) (quoting *MBM Entertainment, LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015)).

[236] *See* 11 U.S.C. §§ 1189–1195.

[237] *In re Roman Catholic Church of the Archdiocese of New Orleans*, 632 B.R.at 600 (quoting *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 228 (2d Cir. 1991)).

[238] *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1971).

### a. Debtor's bankruptcy schedules and statement of financial affairs are not true, complete, or correct

Pursuant to § 521, unless the court orders otherwise, a debtor must file a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs.[239]  Debtors "have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate."[240]  Debtors also have an absolute duty to ensure one's schedules and statement of financial affairs is complete and accurate.[241]  "Indeed, the operation of the bankruptcy system depends on honest reporting."[242]  The consequences for playing fast and loose with the Bankruptcy Code's disclosure requirements are severe.[243]  Evidence that a debtor withheld financial information may result in a finding of bad faith.[244]  Worse, the omission of assets on a debtor's bankruptcy schedules constitutes a crime under 18 U.S.C. § 152.

Bankruptcy Schedules A/B through J and the Statement of Financial Affairs for Individuals Filing for Bankruptcy ("*SoFA*") direct debtors to "[b]e as complete and accurate as possible" in filling out the forms.[245]  The Declaration About an Individual Debtor's Schedules ("*Declaration*") requires a debtor to certify that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."[246]  Here, Debtor filed his original schedules on November 2, 2020, and signed the Declaration.[247]  Debtor amended

---

[239] 11 U.S.C. § 521(a)(1).  *See also* Fed. R. Bankr. P. 1007(b)(1).
[240] *In re Fonke*, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004) (quoting *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)).
[241] *Unruh v. Tow*, 2006 U.S. Dist. LEXIS 112546, at *5 (S.D. Tex. Jan. 30, 2006).
[242] *Id.* (quoting *In re Yonikus*, 996 F.2d 866, 872 (7th Cir. 1993)).
[243] *See In re Unruh*, 2005 Bankr. LEXIS 1284, at *11 (Bankr. S.D. Tex. 2005).
[244] *See In re Unruh*, 265 F. App'x 148, 150 (5th Cir. 2008) ("A finding of bad faith requires some form of deception, such as an effort to mislead creditors or to conceal assets, as opposed to a mere mistaken failure to list an asset or to claim an exemption . . . .  Bad faith may also be shown by a gross and deliberate understatement of value of an asset, made in an attempt to deceive creditors or the bankruptcy court.") (citations omitted).
[245] Official Forms 106A/B, 106C, 106D, 106 E/F, 106G, 106H, 106I, 106J, 107.
[246] Official Form 106Dec.
[247] ECF No. 13.

Schedules A/B, C, D, E/F, H, I, and J on December 9, 2020, and again signed the Declaration.[248] On October 20, 2021, Debtor further amended Schedules A/B, C, D, E/F, and H, signing the Declaration for a third time.[249]  As discussed below, Debtor was not as complete and accurate as possible, nor are his schedules true.

### i.   Debtor failed to disclose several insurance policies in his name

Pursuant to § 541(a), property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case.  The Fifth Circuit has long held that "[i]nsurance policies are property of the estate because, regardless of who the insured is, the debtor retains certain contract rights under the policy itself.  Any rights the debtor has against the insurer, whether contractual or otherwise, become property of the estate."[250]  Schedule A/B requires debtors to disclose any interests in insurance policies and provides examples such as "[h]ealth, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance."[251]

Debtor's Schedule A/B reflects that Debtor has no interest in insurance policies.[252]  However, at the September Hearing, Debtor testified that he has malpractice insurance, health insurance, and disability insurance.[253]  Two months later, Debtor contradicted that testimony, testifying that he had no insurance policies.[254]  The evidence discussed below demonstrates that Debtor had two active disability policies, a health insurance policy, and a professional liability insurance policy at the time of filing.[255]

---

[248] ECF No. 35.
[249] ECF No. 255.
[250] *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55 (5th Cir. 1993).
[251] Official Form 106A/B at 8.
[252] ECF No. 255 at 6, ¶ 31.
[253] ECF No. 223 at 45:24–46:10.
[254] ECF No. 290 at 59:25–60:16.
[255] ECF No. 281-53.

Sometime prior to the November Hearing, Debtor provided Dr. Chowdary with evidence of two disability insurance policies.[256]  When questioned about the first disability policy, Debtor testified that he wasn't sure if the policy was in effect the day he filed bankruptcy and didn't know if the payment due December 26, 2020 was made.[257]  Yet, the document produced by Debtor and admitted into evidence contains a handwritten note: "pd online R17R9-6B201 12/14/20."[258]  When asked why Debtor didn't disclose the policy, Debtor replied, "I'm sure it was missed, and I don't know if it is active anymore."[259]

When questioned about the second disability policy, Debtor testified that he was "not aware of getting two disability policies" and that he "had only one disability policy, but [he's] not sure if it is in existence anymore."[260]  Debtor admitted that the second policy was likewise not disclosed in his schedules.[261]  The second policy also contains a handwritten note: "pd online R17R7-0K3QG 12/14/20."[262]  Debtor offered no evidence demonstrating that either disability policy was inactive on Debtor's October 16, 2020 petition date.

Debtor also produced a BlueCross BlueShield of Texas rate change notice to Dr. Chowdary.[263]  Debtor testified that he is the named insured on the BlueCross BlueShield policy and that the Clinic pays for the policy.[264]  When asked why he failed to disclose that insurance policy Debtor said "I didn't know this needed to be disclosed."[265]  When asked whether this policy was in place when he filed bankruptcy,  Debtor evasively answered, "I'm not sure if it was BlueCross

---

[256] ECF No. 290 at 60:17–61:11.
[257] Id. at 60:14–61:7.
[258] ECF No. 281-53 at 1.  No hearsay objection was made to the handwritten note.  ECF No. 290 at 64:15–20.
[259] ECF No. 290 at 61:12–16.
[260] Id. at 62:2–13.
[261] Id. at 62:14–16.
[262] ECF No. 281-53 at 2.
[263] Id. at 4; ECF No. 290 at 63:20–23.
[264] ECF No. 290 at 64:2–7.
[265] Id. at 64:8–10.

or some other health insurance company at that time."[266]  Whether it was BlueCross or another

company, Debtor's testimony reveals that he knew he had a health insurance policy at the time he

filed for bankruptcy.  Schedule A/B expressly identifies "health insurance" as a type the debtor

must disclose.

Debtor additionally produced evidence of a professional liability insurance policy.[267]  The

policy's retroactive effective date is April 4, 1996, it was in effect on December 1, 2020, and was

set to expire on December 1, 2021.[268]  Debtor admitted that he currently has professional liability

insurance and that it was in place when he filed bankruptcy.[269]  When asked why he didn't disclose

the policy in Schedule A/B, Debtor responded, "I didn't know this needed to be included."[270]  Alt-

hough "professional liability insurance" is not specifically identified on line 31 of Schedule A/B,

question 31 merely provides examples.  Question 31 requires disclosure of all insurance policies

in which the debtor has an interest.

Debtor failed to follow the cardinal rule: disclose, disclose, disclose.[271]  But not only did

Debtor fail to disclose several insurance policies, Debtor lied under oath.  Debtor first testified that

he had malpractice, health, and disability insurance, later testifying that he had no insurance poli-

cies, and finally testifying that he just didn't know he needed to disclose those policies.

While "the Court will not find bad faith conduct for apparent inadvertent inaccuracies" in

a debtor's schedules,[272] "[a] failure to disclose information (leaving a 'blank') in a bankruptcy

schedule or statement of financial affairs is an affirmative statement that there is no information

---

[266] *Id.* at 64:11–14.
[267] ECF No. 281-53 at 3; ECF No. 290 at 62:17–23.
[268] ECF No. 281-53 at 3.
[269] ECF No. 290 at 24–63:4.
[270] *Id.* at 63:5–19.
[271] *Sanchez v. Ameriquest Mortg. Co. (In re Sanchez)*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007) ("The three most important words in the bankruptcy system are: disclose, disclose, disclose.").
[272] *In re Hurtado*, 2017 Bankr. LEXIS 3841, at *17 (Bankr. S.D. Tex. Nov. 6, 2017).

reasonably available to the Debtor that is responsive to that question.  An incorrect affirmative statement is not inadvertence."[273]  Here, Debtor did more than leave question 31 on Schedule A/B blank; he answered "no."  Given Debtor's untruthful testimony and the evidence of four separate insurance policies in Debtor's name, Debtor's incorrect statement in response to question 31 of Schedule A/B was not inadvertent.[274]

Accordingly, the Court finds Debtor's failure to disclose his two disability insurance policies, his health insurance policy, and his professional liability insurance policy in Schedule A/B constitutes bad faith conduct.

### ii.  Debtor failed to disclose his business connection to Fatih Management

Question 27 of the SoFA asks "[w]ithin 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?"  Those connections are: (1) a sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time; (2) a member of LLC or LLP; (3) a partner in a partnership; (4) an officer, director, or managing executive of a corporation; or (5) an owner of at least 5% of the voting or equity securities of a corporation.  Debtors must sign the SoFA certifying that:

> I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct.  I understand that making a false statement, concealing property, or obtaining money or property in fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.

---

[273] *West v. Family Express Corp. (In re Bilstat, Inc.)*, 314 B.R. 603, 610 (Bankr. S.D. Tex. 2004).
[274] *Cf. In re Hurtado*, 2017 Bankr. LEXIS 3841, at *17 (holding that where debtors failed to disclose rental income on their statement of financial affairs, but had disclosed such information on the means test and in their schedules, and where there was no evidence in the record that the debtors were intentionally inaccurate on their statement of financial affairs, "the Court [would] not find bad faith conduct for apparent inadvertent inaccuracies.").

In response to question 27, Debtor answered "[n]o.  None of the above applies" and signed the SoFA.[275]  Uncontroverted documentary evidence establishes that Debtor is a member of Fatih Management, an LLC.[276]

Accordingly, the Court finds that Debtor's failure to make a full and candid disclosure of his membership interest in Fatih Management constitutes bad faith conduct.

### iii.  Debtor withheld information regarding credit cards

Debtor's Schedule E/F lists a nonpriority unsecured claim for American Express in an amount listed as "unknown."[277]  Debtor did not list the last four digits of the account number, disclose when the debt was incurred, or specify the type of claim.[278]  At the January 2022 Hearing, Debtor testified that he did not provide the last four digits of the account number because "[he doesn't] have that card anymore.  It was already canceled."[279]  Debtor testified that he canceled the card about a month before he filed for bankruptcy, but that Mrs. Ozcelebi continued using the account.[280]  Schedule E/F does not ask the debtor to list the last four digits of the account number only if the account is still active.  Debtor's excuse for not providing the last four digits is unsatisfactory to this Court.  Debtor could have easily obtained this information from American Express, a billing statement, or his accountant.

Question 20 of the SoFA asks, "[w]ithin 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?"  Debtor answer "No."[281]  However, Debtor's testimony was that he cancelled his American Express credit card about a month before he filed bankruptcy.  Thus, Debtor closed a

---

275 ECF No. 35 at 27–28.
276 ECF No. 286-3.
277 ECF No. 255 at 14, ¶ 4.1.
278 *Id.*
279 ECF No. 340 at 14:12–17.
280 *Id.* at 14:18–19, 55:1–14.
281 ECF No. 35 at 26.

financial account.  Debtor should have disclosed that in response to question 20 and, in failing to do so, Debtor did not carry out his "paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."[282]

Debtor also testified that he "maybe" had a Visa credit card that was also canceled prior to filing for bankruptcy.[283]  When questioned about why the Visa card was not listed in his schedules, Debtor responded, "I don't know if I had it, sir.  Maybe I didn't have it.  It is more than a year ago . . . . It looks like I didn't have it."  When asked what bank the Visa card was associated with, Debtor replied, "I said I'm not sure if I had it.  It looks like I didn't put it so it looks like I didn't have any Visa credit card."[284]

It's not lost on the Court that Debtor didn't disclose his business connection to Fatih Management or the four insurance policies in his name, yet he had both.  Given Debtor's repeated failures to disclose and his series of lies to this Court, his statement that because the Visa card wasn't listed "it looks like" he didn't have one has zero credibility.  The Court questions whether Debtor is still actively using a Visa card or otherwise concealing information about such card.

Lastly, Debtor testified that the Clinic has an American Express credit card that also bears his name.[285]  There is no evidence in the record from which this Court can determine whether Debtor personally guaranteed the American Express Business card or whether Debtor is merely an authorized user of that card.  However, given Debtor's testimony that his name appears on the card, Debtor is at least an authorized user of that card.  Moreover, question 23 of the SoFA asks,

---

[282] *In re Dreyer*, 127 B.R. 587, 594 (Bankr. N.D. Tex. 1991) (citing *Friedman v. Sofro (In re Sofro)*, 110 B.R. 989, 991 (Bankr. S.D. Fla. 1990)).
[283] ECF No. 340 at 13:4–9.
[284] *Id.* at 15:2–15.
[285] *Id.* at 54:3–18.

"[d]o you hold or control any property that someone else owns?"  At a minimum, Debtor should have disclosed the business credit card in response to question 23.  Yet, Debtor did not disclose that card in his schedules or SoFA, nor has he ever disclosed any of the charges made on that card in his MORs.[286]  The card was brought to this Court's attention for the first time at the January 2022 Hearing.

Accordingly, the Court finds that Debtor's failure to make a full and candid disclosure about his credit cards in both his schedules and his Statement of Financial Affairs constitutes bad faith conduct.

### iv.  Debtor failed to disclose his possession and control of the Ford F-150 that is owned by the Clinic

As noted, question 23 of the SoFA requires a debtor to disclose property in his possession or control that is owned by another.  At the January 2022 Hearing, Debtor testified that he does not own a car and that the only car he drives is the Clinic's company car.[287]  Given Debtor's possession and control of the vehicle owned by the Clinic, Debtor should have also listed it in response to question 23, but instead, Debtor responded "[n]o" to question 23.

Accordingly, the Court finds that Debtor's failure to make a full and candid disclosure about the property he holds or controls that is owned by another constitutes bad faith conduct.

### v.  Debtor concealed the true value of assets in which he has an interest

"A debtor has a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."[288]

---

[286] *Id.* at 54:19–25.
[287] *Id.* at 53:14–20.
[288] *In re Dreyer*, 127 B.R. at 594.

Schedule A/B: Property requires debtors to disclose the current value of the portion they own in each financial asset.[289]  In *Cusano*, the Ninth Circuit stated:

> Although there are no bright-line rules for how much itemization and specificity is required [in preparing one's schedules, a debtor is] required to be as particular as is reasonable under the circumstances.  If possible, [a debtor is] to list the approximate dollar amount of each asset.  If faced with a range of values, he has to choose a value in the middle of the range.  There are assets, however, the value of which is unknown; when that is the case, a simple statement to that effect will suffice.[290]

As stated, there are circumstances under which scheduling an asset's value as "unknown" is appropriate; however, doing so when a debtor has access to information from which either an exact or approximate valuation is ascertainable is not "reasonable under the circumstances."[291]

 Listing as asset's value as unknown when doing so is not reasonable under the circumstances may also lead to a finding of bad faith.  "A finding of bad faith requires some form of deception, such as an effort to mislead creditors or to conceal assets, as opposed to a mere mistaken failure to list an asset or to claim an exemption."[292]  This Court holds that where a debtor lists an asset's value as "unknown" with the intent to mislead creditors or to conceal the true value of the asset, a finding of bad faith conduct may be warranted.

In *In re Ligon*, 55 B.R. 250, 253 (Bankr. M.D. Tenn. 1985), the debtor scheduled his interest in certain stock with an "unknown" value.  Noting that the debtor previously valued his stock on two separate occasions and knew the appraised value of the stock, the court found that "[t]he debtor's valuing of the stock as unknown was a poorly conceived effort to disguise and conceal this substantial asset.  This concealment was knowingly attempted and the inference of fraud is unavoidable."[293]  The court also found that the debtor omitted his gun collection and a one-third

---

[289] Official Form 106A/B at 5, Part 4.
[290] *Cusano v. Klein*, 264 F.3d 936, 946 (9th Cir. 2001) (internal citations and quotation marks omitted).
[291] *See Cusano*, 264 F.3d at 946 (internal citations and quotation marks omitted).
[292] *In re Unruh*, 265 F. App'x at 150.
[293] *In re Ligon*, 55 B.R. 250, 253 (Bankr. M.D. Tenn. 1985).

remainder interest in real property and that despite the debtor's 30 years of experience as a banker and testimony from the debtor's wife that their house had appreciated in value, the debtor know-ingly and fraudulently undervalued his home.[294]   The court denied the debtor's discharge, conclud-ing  that "[n]otwithstanding several opportunities to offer innocent explanations for the omissions and pattern of undervaluing, this debtor has offered no rational or credible evidence to rebut the overwhelming proof of knowing concealment and fraud in this case."[295]

In contrast, in *Parnes v. Parnes (In re Parnes)*, 200 B.R. 710, 715 (Bankr. N.D. Ga. 1996), the debtor listed the value of his one-half interest in three dental practices as "unknown."  The court found credible the debtor's testimony that he believed the value of the interest was in the negative because "he did not believe anyone would buy half a dental practice with debt."[296]  Upon consulting with his attorney, the two decided to list the value as "unknown" because no numerical value could be substantiated.[297]  The debtor believed any numerical value highly speculative.[298] The debtor's attorney and an expert witness also testified about the difficulties of valuing an inter-est in a partnership in a forced bankruptcy liquidation.[299]  Given the evidence, the court concluded that the debtor did not act with fraudulent intent or with any intent to mislead the trustee or the creditors.[300]

### a)  The value of Debtor's interest in the Trusts

Debtor's Schedule A/B lists Debtor and Mrs. Ozcelebi as 50/50 beneficiaries of the Trusts, denoting the value of Debtor's interest as "unknown."[301]  Debtor testified that the values are listed

---

[294] *Id.*
[295] *Id.*
[296] *Id.* at 716–17.
[297] *Id.* at 717.
[298] *Id.*
[299] *Id.*
[300] *Id.* at 718.
[301] ECF No. 255 at 6, ¶ 25.

as unknown because the valuation is complicated.[302]  Debtor explained that if he asked a hospital to buy his clinical practice, the hospital would give one price while a hedge fund would give another.[303]  Confusingly, the sale value of Debtor's clinical practice has nothing to do with the value of his interest in the Trusts.  Although Lyra receives regular transfers indirectly from the Clinic, the present value of Debtor's interest in Lyra as a beneficiary is independent of the sale value of Debtor's practice.  Despite his testimony that valuation is complicated, Debtor finally admitted that he never attempted to value his interest in the Trusts.[304]  Debtor's "Brief in Support of Confirmation of Amended Plan" ("*Brief in Support of Confirmation*") maintains that listing the value of his interest in the Trusts as "unknown" was appropriate because Debtor allegedly has "no right to demand a distribution of any transfers or additions under Article IV" of the Trust Agreements.[305]  Debtor's beneficial interest in the Trusts is not limited by his ability to demand trust distributions.  Article II of the Trust Agreements provide that "[t]he Trustees shall distribute, at least annually, in equal shares among the beneficiaries of the trust all or any part of the net income of the trust for the comfort, support, education, maintenance, health and welfare of the beneficiaries."[306]  Debtor's Brief in Support of Confirmation says nothing about why listing the value as "unknown" is appropriate despite Debtor's entitlement to annual distributions, regardless of any demand.  Given Debtor's admission that he never attempted to value his interest in the Trusts, his justifications—i.e., valuation was difficult; no right to demand—are unsubstantiated.

Debtor's failure to provide numerical values was not reasonable under the circumstances.[307]  The Trust Agreements require the trustee to prepare a yearly balance sheet, accounting

---

[302] ECF No. 290 at 115:17–116:3.
[303] *Id.*
[304] *Id.* at 116:22–25.
[305] ECF No. 298 at 11–12, ¶ 29.
[306] ECF Nos. 286-4, 286-5, 286-6.
[307] *See Cusano*, 264 F.3d at 946.

for the value and liability of the assets held by the Trusts and "render annual accounts to the beneficiary or beneficiaries of such trust."[308]  Debtor, as a beneficiary, is also entitled to an accounting under Texas law upon written demand.[309]  Debtor testified that "if [the UST] want[s], [Debtor] can maybe ask the trustee to estimate" the value of the Trusts.[310]  Additionally, Debtor was presented with a statement for Solano reflecting a balance of about $7.5 million.[311]  Debtor admitted that the statement could be used to ascertain the value of Solano.  Debtor could have used any of those resources to, at the very least, estimate the value of his interest in the Trusts.  Lastly, Debtor's SoFA shows that Debtor received $222,098.50 in Trust distributions in 2018, $255,180.43 in 2019, and $93,288.58 in the first 10 months of 2020.[312]  Keeping with Debtor's "best information available for the Debtor's historical income on the Petition Date"[313] sentiment, Debtor could have used the historical data disclosed in his SoFA to numerically value his interest in the Trusts.  Yet, Debtor admittedly made no attempt to do so.

Unlike the debtor in *Parnes* who listed his interest as unknown based on the dental practices' indebtedness, his credible belief that any numerical valuation would be highly speculative, and the advice of his counsel, Debtor here had no basis for listing his interests as unknown because he simply never attempted to value them despite having access to several resources from which an evaluation could have been made.  The debtor in *Parnes* also offered the testimony of his counsel and an expert witness that further demonstrated why valuing the interest as unknown was reasonable under the circumstances.  Debtor here offered no additional evidence or witness testimony.  By not attempting to value his interest in the Trusts, Debtor neglected his "paramount duty to

---

[308] ECF Nos. 247–2, 247–3, 247–4 at 15 (21.7.4), 19 (Article XI).
[309] TEX. PROP. CODE § 113.151(a).
[310] ECF No. 290 at 116:22–25.
[311] *Id.* at 118:7–17.
[312] ECF No. 35 at 23, ¶ 5.
[313] *See* ECF No. 285 at 1–2, ¶¶ 3–4.

carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."[314]

The evidence demonstrates that the Trusts are of significant value and so is Debtor's interest therein. The most recent valuation information for Vega and Lyra in evidence are tax records from 2018 and 2019.[315] In 2018, Vega's beginning capital balance was $1,095,342, its net income was $739,780, and $645,721 was withdrawn or distributed.[316] In 2019, Vega's beginning capital account balance was $1,189,401, its net income was $920,708, and $1,205,109 was withdrawn or distributed.[317] Vega's ending capital account balance in 2019 was $905,000.[318] In 2018, Lyra's beginning capital account balance was $105,898, its net income was $597,514, and $514,502 was withdrawn or distributed.[319] In 2019, Lyra's beginning capital account balance was $185,910, its net income was $518,834, there was an additional "other increase" of $825,000, and $572,712 was withdrawn or distributed.[320] Lyra's ending capital account balance in 2019 was $957,032.[321] The most recent valuation information in evidence for Solano is a Vanguard account statement dated 10, 2021, reflecting a balance of $7,519,021.78.[322] As noted above, Debtor's SoFA shows that Debtor received $222,098.50 in Trust distributions in 2018, $255,180.43 in 2019, and $93,288.58 in the first 10 months of 2020.[323] If Debtor received no additional Trust distributions in 2020, Debtor averaged about $190,000 in Trust distributions per year from 2018 to 2020.

---

[314] *See In re Dreyer*, 127 B.R. at 594.
[315] ECF No. 281-70 at 2–5.
[316] *Id.* at 3.
[317] *Id.* at 2.
[318] *Id.*
[319] *Id.* at 5.
[320] *Id.* at 4.
[321] *Id.*
[322] ECF No. 286-7.
[323] ECF No. 35 at 23, ¶ 5.

Like the debtor in *Ligon*, whom the Court found knew the value of his stocks due to prior valuations and an appraisal, Debtor here knew exactly how much was disbursed to him from Vega and Lyra in 2018, 2019, and 2020 and had access to information from which he could at least approximate the values of the Trusts and thus, his interest therein. Additionally, this Court, like the *Ligon* court, finds that Debtor's interest in the Trusts—whether an asset of the bankruptcy estate or not—is a significant asset. Therefore, Debtor's valuing the interest as unknown was a poorly conceived effort to disguise and conceal a substantial asset.[324]

Accordingly, the Court finds that by listing the value of his interest in the Trusts as "unknown" given the abundance of information available to him, Debtor failed to make a full and candid disclosure and acted in bad faith in carrying out his duty under § 521 and constitutes bad faith conduct.

### b) The value of Debtor's interest in Fatih Management and Mission Business

Debtor scheduled a community property interest in two LLCs, Mission Business and Fatih Management.[325] Mrs. Ozcelebi has a 1% interest in Mission Business and Fatih Management.[326] The value of Debtor's interest in that community property is listed as "unknown."[327] Mission Business has a .2% interest in McAllen Business, which itself has significant interest in three LLCs and two LPs, a .1% interest in Horseshoe Hay Farm LLC, and a .1% interest in Solano Land LLC.[328] Fatih Management has a .1% interest in the Clinic.[329] It's unknown whether Mission Business and Fatih Management have any interest in additional entities.

At the November Hearing, Debtor and the UST engaged in the following exchange:

---

[324] *In re Ligon*, 55 B.R. at 253.
[325] ECF Nos. 255 at 4, ¶ 19, 298 at 10, ¶ 26.
[326] ECF No. 255 at 4, ¶ 19.
[327] *Id.*
[328] ECF No. 285-1 at 3–4.
[329] *Id.* at 2.

UST:    Here, in question No. 19 [of Schedule A/B], you mentioned that you have a - - or your spouse had a one percent ownership interest in Mission Business Management, LLC and Fatih Ozcelebi Management, LLC and the value of those corporations or the interest in those corporations were disclosed as "unknown." Why is that? Why was the value disclosed as "unknown?"

Debtor: Because Mission Business Management, LLC -- I mean, my wife through this Mission Business Management, LLC (indiscernible) let's say, McAllen Business Management, LP, through this company it owns, let's say McAllen Business Management owns $50,000, Julie Ozcelebi owns only $1. So, McAllen Business Management owns $10 million, Julie Ozcelebi owns $400. So, it is a miniscule amount, so we put "unknown."[330]

UST:    By your answer I get that it is possible for you to calculate the amount. If it's just a value of one percent, you can do that. Why didn't you?

Debtor: Because we didn't know the amount then of the valuation of McAllen Business Management. It's a bit complicated.[331]

Debtor's testimony provides an incomplete picture. Mission Business has membership interests in not only McAllen Business, but also in Horseshoe Hay Farm LLC and Solano Land LLC, yet Debtor made no mention of those entities in his testimony. And Faith Management has no ownership interest in McAllen Business, so not knowing the value of McAllen Business had no impact on the value of Fatih Management, yet Debtor didn't value that entity either.

The true reason Debtor listed his interest as "unknown" was revealed in Debtor's next response:

UST:    Did you attempt to figure out the value of these corporations?

Debtor: No. I didn't. It's difficult to figure out.[332]

---

[330] The Court first notes that Debtor likely meant refer to Mission Business instead of McAllen Business in his initial response because according to Debtor's Second Plan Supplement, Mrs. Ozcelebi doesn't share ownership interests with McAllen Business in any entity. ECF No. 285-1.
[331] ECF No. 290 at 114:5–115:6; November 29, 2021 Hearing at 3:19:30–3:22:10.
[332] ECF No. 290 at 115:1–16.

Given Debtor's admission that he never attempted to value his interest in Mission Business or Fatih Management, his testimony that valuation is difficult or that his interest in the various business entities is miniscule is unsubstantiated.

Debtor's Brief in Support of Confirmation maintains that "it was appropriate for Debtor to list an unknown value with respect to his contingent community property interest in Mission Business Management LLC and Fatih Ozcelebi MD Management, LLC, first because it is contingent and second because the ownership interest would be a negligible ownership percentage – 0.5%."[333] Debtor asserts that "[w]hile the UST claims [Mission Business Management LLC and Fatih Management] 'likely [have] some value,' such assertion is without merit when investigated."[334]   Yet, Debtor provides no evidence of the alleged investigation that proves the UST's assertion is without merit.   All that's before this Court is Debtor's bald assertion that any interest is contingent and negligible; a highly questionable assertion particularly with respect to Mission Business because of its .2% interest in McAllen Business, which has interests in several other entities.   Debtor's assertions are self-serving.   Debtor's duty is to disclose and value his interests in property, regardless of whether he believes those interests are worthless.[335]   This Court, as the fact finder, determines whether those interests are "miniscule" or "negligible," not Debtor.

Debtor's failure to provide numerical values was not reasonable under the circumstances.[336]   Debtor's Brief in Support of Confirmation alludes that the value of Fatih Management and Mission Business was "investigated."[337]   Debtor could have easily calculated the numerical value of his interest based on the alleged investigation.   If Debtor did in fact investigate the value

---

[333] ECF No. 298 at 11, ¶ 28.
[334] *Id.*
[335] *See In re Fonke*, 310 B.R. at 817 (quoting *In re Yonikus*, 974 F.2d at 904).
[336] *See Cusano*, 264 F.3d at 946.
[337] ECF No. 298 at 11, ¶ 28 ("While the UST claims the entities 'likely [have] some value,' such assertion is without merit when investigated.").

of Mission Business and Fatih Management, then why not calculate, and disclose the value of his interest?  Why subject himself to the scrutiny by the UST, the Subchapter V Trustee, his creditors, and this Court?  Why spend time filing a Brief in Support of Confirmation defending his decision to list the value as "unknown" when he could have just disclosed the value?  No reasonable, good faith explanation exists.  The only explanation is that Debtor listed his interest as unknown to mislead creditors and this Court or conceal the true value of the assets.  Debtor again failed to carry out his "paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."[338]

Accordingly, the Court finds that by listing the value of his interest in Fatih Management and Mission Business as "unknown" given the information available to him, Debtor did not make a full and candid disclosure of his interests and acted in bad faith in carrying out his duty under § 521 and constitutes bad faith conduct.

### vi. Debtor mis-scheduled claims and inflated his liabilities to mislead this Court and creditors

Schedule D: Creditors Who Have Claims Secured by Property, asks debtors, "[d]o any creditors have claims secured by your property?"  The instructions for Schedule D direct debtors to "list anyone who has judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and *other security interests against your property*."[339]  Schedule E/F: Creditors Who Have Unsecured Claims, asks debtors, "[d]o any creditors have priority unsecured claims against you?" and "[d]o any creditors have nonpriority unsecured claims against you?"  The instructions for Schedule E/F explain that "[c]reditors with unsecured claims *do not* have liens or other security interests in your property."[340]

---

[338] *In re Dreyer*, 127 B.R. at 594.
[339] Emphasis added.
[340] Emphasis added.

No creditors are listed in Debtor's Amended Schedule D.[341]  Debtor's Amended Schedule E/F lists, inter alia, two claims relevant here: one to Cengiz for $1,295,000 and one to Lyra for $825,000.[342]  The Court analyzes these alleged unsecured claims in turn.

### a)  Debtor inaccurately scheduled two allegedly unsecured claims

Cengiz's claim is scheduled[343] as follows:

| 4.2 | Cengiz Ozcelebi | | | | $1,295,000.00 |
|---|---|---|---|---|---|

Nonpriority Creditor's Name  
**Plajyolu Sok 9/2, Karel Apartments Istanbul, Turkey 81070**  
Number Street City State Zip Code

Last 4 digits of account number _____

When was the debt incurred? _____

**Who incurred the debt? Check one.**
- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☒ At least one of the debtors and another
- ☐ Check if this claim is for a  community debt

**Is the claim subject to offset?**
- ■ No
- ☐ Yes

**As of the date you file, the claim is: Check all that apply**
- ☒ Contingent
- ☒ Unliquidated
- ☐ Disputed

**Type of NONPRIORITY unsecured claim:**
- ☐ Student loans
- ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
- ☐ Debts to pension or profit-sharing plans, and other similar debts
- ■ Other. Specify **Loan for Solano Land LLC**

The only evidence in the record supporting this claim is a Release of Lien executed by Cengiz on March 12, 2021 ("*Release*").[344]  The Release references a note dated October 27, 2010, in the original principal amount of $1,295,000.00, with Solano Land LLC as the borrower and Cengiz as the lender ("*Release Note*").[345]  The Release also provides:

> Note and Lien are described in the Following Documents:
>
> Deed of Trust dated October 27, 2010, recorded on November 27, 2013, under Clerk's File No. 2467991, Official Records, Hidalgo County, Texas, executed by SOLANO LAND, LLC, in favor of JOHN H. GRABOWSKI, Trustee, securing the payment of one note in the principal amount of $1,295,000.00, and any other amounts payable under the terms of said Deed of Trust, payable as therein provided to the order of CENGIZ OZCELEBI.[346]

---

[341] ECF No. 255 at 12.  Debtor's original Schedule D listed Chamberlain as a secured creditor.  ECF No. 35 at 11.
[342] ECF No. 255 at 15–16.
[343] *Id.* at 15.
[344] ECF No. 230-11 at 2.
[345] *Id.*
[346] *Id.*

The Deed of Trust that allegedly describes the Release Note is not in evidence and nothing in the Release reflects that Debtor is liable for the $1,295,000.00 loan to Solano Land LLC.  However, Debtor scheduled the debt and testified that he was a co-signer on the loan.[347]

Debtor conflates the Release Note with another promissory note admitted into evidence. That other promissory note reflects a loan in the principal amount of $1,294,970.00 made by Cengiz as lender to "Onder Ari, Trustee, Solano Heritage Trust of 812 Brazos Street Mission Texas 78572 (individually and collectively the 'Borrower')" ("*Solano Trust Note*").  At the October Hearing, Debtor was questioned about the $1,295,000 loan made to Solano Land LLC, and then shown the Solano Trust Note and asked "[i]s this the note we've been talking about?"[348]  Debtor responded, "[y]es."[349]

Notably, the Solano Trust Note is different from the Release Note in several ways.  First, the former is for $1,294,970, the latter is for $1,295,000, a small difference.  Second, the borrower on the former is Onder Ari, Trustee, Solano Heritage Trust, the borrower on the latter is Solano Land LLC.  Third, the former is dated November 10, 2010, the latter is dated October 27, 2010. Fourth, Debtor testified that he was a co-signer on the latter, Debtor is not listed as a borrower, co-signer, or guarantor on the former, but paragraph 9 of the Solano Trust Note states:

> This Note is secured by the following security (the 'Security'): The monies in the bank accounts of Solano Heritage Trust, all receivables of Solano Heritage Trust, all shares, interests, and receivables from any companies that Solano Heritage Trust owns, anything in control and ownership of Solano Heritage Trust, all properties owned by Solano Land LLC, all interests, income, receivables, and anything in the control and ownership of Solano Land LLC, *Fatih Ozcelebi's personal income from all sources*, Julie Ozcelebi's personal income from all sources, all properties and

---

[347] ECF Nos. 108 at 82:17–83:9, 269 at 31:1–3.

[348] ECF No. 269 at 29:5–33:14.

[349] *Id.* at 33:15. *See also id.* at 68:9–15 (UST: "You - - in your testimony, you stated that it is your intention to pay back your brother.  Considering - - and also, we've seen documents showing that the borrower of that loan to your brother was the Solano Heritage Trust.  Why hasn't the Solano Heritage Trust paid your brother?"  Debtor: "Because Judge Rodriguez said they don't owe any monies anywhere.")  The Court notes the inaccuracy of Debtor's statement but finds this statement evidence that Debtor considers the loan made to Solano Land LLC for $1.295 million and the loan made to the Solano Heritage Trust for $1,294,970 to be the same loan.

> account receivables of McAllen Gastroenterology Clinic LP, and Fatih Ozcelebi MD Management LLC, all income and receivables, and shares of McAllen Business Management LP and Mission Business Management LP, and all interests of McAllen Business Management LP and Mission Business Management LP in any real estate, or company.[350]

Additionally, Debtor pledged as collateral all his assets and income to Cengiz as security for the Solano Trust Note, as reflected in a UCC Financing Statement.[351]

The numerous differences between the Release Note and the Solano Trust Note demonstrate that they are not the same notes, despite Debtor's testimony conflating the two. As noted, nothing in the Release reflects that Debtor is a co-signer on the Release Note. Therefore, beyond Debtor's testimony that he co-signed for the $1,295,000 made to Solano Land LLC and Schedule E/F, there is nothing from which this Court can conclude that Debtor is liable on the Release Note. However, the Court concludes that Debtor is contingently liable on the Solano Trust Note because Texas law defines a "debtor" as a person having an interest, *other than a security interest or other lien*, in the collateral, whether or not the person is an obligor"[352] and Debtor pledged his personal income from all sources as security for the Solano Trust Note.[353] Debtor has an interest, other than a security interest or other lien, in his personal income from all sources.

Absent evidence that Debtor is liable on the Release Note, of the two notes, the only one that should have been scheduled is the Solano Trust Note. And, the Solano Trust Note should have been listed on Schedule D as a secured debt given paragraph 9 of the note and the accompanying UCC Financing Statement. Nevertheless, Debtor scheduled the Release Note on Schedule E/F and listed Solano Land LLC as a co-debtor on Amended Schedule H.[354]

---

[350] ECF No. 281-89 (emphasis added).
[351] ECF Nos. 281-59 at 1; 290 at 94:9–15.
[352] TEX. BUS. & COMM. CODE § 9.102(28)(A) (emphasis added).
[353] ECF No. 281-89.
[354] ECF No. 255 at 18.

When asked why he didn't list the Solano Trust Note on Schedule D, Debtor responded "I hired lawyers who helped me.  I - - I filled it out as accurate as possible.  And I - - I wasn't hiding anything, first.  Second, [the UCC Financial Statement] is a public document and you have access, anybody can have access to this document."[355]  It is Debtor's duty alone to make full and honest disclosures; "the trustee and the creditors should not be forced to search out the true state of affairs."[356]

Next, Debtor scheduled[357] a debt allegedly owed to Lyra as follows:

| 4.5 | **Lyra Heritage Trust** | Last 4 digits of account number | | $825,000.00 |
|---|---|---|---|---|
| | Nonpriority Creditor's Name | | | |
| | **c/o Cengiz Ozcelebi, Trustee** | When was the debt incurred?  Over the course of 13 years | | |
| | **Plajyolu Sok 9/2, Karel Apartments** | | | |
| | **Istanbul, Turkey  81070** | | | |
| | Number Street City State Zip Code | As of the date you file, the claim is: Check all that apply | | |
| | Who incurred the debt? Check one. | | | |
| | ■ Debtor 1 only | ☐ Contingent | | |
| | ☐ Debtor 2 only | ☐ Unliquidated | | |
| | ☐ Debtor 1 and Debtor 2 only | ☐ Disputed | | |
| | ☐ At least one of the debtors and another | Type of NONPRIORITY unsecured claim: | | |
| | ☐ Check if this claim is for a community debt | ☐ Student loans | | |
| | Is the claim subject to offset? | ☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims | | |
| | ■ No | ☐ Debts to pension or profit-sharing plans, and other similar debts | | |
| | ☐ Yes | ■ Other. Specify  Loan for legal fees | | |

There are two $825,000 notes in the record: one executed on December 3, 2017 between Lyra as borrower and the Clinic as lender ("*Lyra Note*")[358] and another nearly identical note executed on July 16, 2020 between Debtor as borrower and the Clinic as lender ("*Dr. Ozcelebi Note*").[359]  Both notes provide that, "[i]n the years between 2006 and present time [the borrower] has received and promises to payback [the Clinic] the principal sum of eight hundred twenty five thousand USD ($825,000) with interest accruing of the unpaid balance at a rate of 5% per annum . . . ."[360]  When

[355] ECF No. 269 at 47:23–48:17.
[356] *In re Mazzola*, 4 B.R. 179, 183 (Bankr. D. Mass. 1980) (citing *In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974)).
[357] ECF No. 255 at 16.
[358] ECF No. 281-58.
[359] ECF No. 281-88.
[360] ECF Nos. 281-58, 281-88.

asked why he didn't disclose that he owed another $825,000 to the Clinic, Debtor responded "I don't owe to both Lyra and [the Clinic]; I owed to Lyra Heritage Trust . . . . I mean, they aren't like two - - two different loans.  Lyra Heritage Trust owns almost all of McAllen Gastroenterology Clinic."[361]  Nevertheless, Lyra is not the Clinic, and the evidence demonstrates that Debtor does not owe $825,000 to Lyra, he owes $825,000 to the Clinic.  Therefore, Debtor's Schedule E/F is not only misleading, but also incorrect.

Moreover, Debtor failed to disclose a UCC Financing Statement pledging "all personal salaries, distributions from any companies, rent, any income from any sources and property of Fatih Ozcelebi" to the Clinic as security for the Dr. Ozcelebi Note.[362]  Debtor testified that he did not disclose the pledge because the UCC Financing Statement is a public document and he didn't know that he had to disclose it.[363]  According to paragraph 10 of the Dr. Ozcelebi Note[364] and the accompanying UCC Financing Statement,[365] the debt is secured and thus, should have been listed on Schedule D, but instead, it was not scheduled at all.[366]  Again, it is Debtor's duty alone to make full and honest disclosures; "the trustee and the creditors should not be forced to search out the true state of affairs."[367]

### b)  Debtor inflated his liabilities to mislead creditors and this Court

Far more disturbing than Debtor's flippant attitude about his duty to disclose however is the overwhelming evidence demonstrating that the claims in question were intended to mislead

---

[361] ECF No. 290 96:15–97:6.
[362] ECF Nos. 281-61, 290 at 95:1–17.
[363] ECF No. 290 at 95:12–17.
[364] ECF No. 281-88 at 1, ¶ 10 ("PRIORITY: The Lender shall be designated as the "First Priority Creditor" and this NOTE will represent a first priority security and lien against any income or property the Borrower owns.").
[365] ECF No. 281-61.
[366] ECF No. 255.
[367] *In re Mazzola*, 4 B.R. at 183.

creditors and this Court into believing Debtor's liabilities were greater than in reality.  The Court

again begins with the Release Note.

Debtor testified that the $1,295,000 loan from Cengiz was used to purchase 400 acres of

farmland in Hargill, Texas ("*Hargill Farm*").[368]  A Warranty Deed with Vendor's Lien for a por-

tion of the Hargill Farm was executed on May 3, 2021, in the amount of $1,354,100.[369]  Prior to

that, the Release was executed on March 29, 2021, releasing from Cengiz's lien the portion of the

Hargill Farm that was later sold.[370]  The Release also provided that "Holder of Note and Lien

acknowledges payment in full of the Note . . . ."[371]  Despite the Release, Debtor testified that the

debt was never paid to Cengiz,[372] and that Debtor intends to repay the debt because Cengiz "gave

[Debtor] the money and [Cengiz] wants his money back."[373]  Debtor testified that the proceeds

from the sale of Hargill Farm were deposited into Solano's Vanguard account.[374]

Given Debtor's expressed intent to pay the debt and loan documents showing Solano as a

borrower, the UST asked Debtor, "[w]hy hasn't the Solano Heritage Trust paid your brother?"[375]

Debtor answered, "[b]ecause Judge Rodriguez said they don't owe any monies anywhere."[376]  No

request to allow Solano to pay Cengiz from the proceeds of the Hargill Farm sale was made to this

Court.  This Court wasn't even aware that the Hargill Farm was sold until Dr. Chowdary filed his

"Emergency Motion to Summarily Deny Confirmation of Fraudulent Plan" on September 9, 2021,

---

[368] ECF Nos. 281-64 at 17:1–21, 25:25–26:19, 37:12–21, 54:8–17, 269 at 23:20–31:3.
[369] *Compare* ECF No. 281-84 ("A 361.39 acre tract of land being all of Lots 7, 9, the North 1/2 of Lot 11, all of Lots 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and the North 1/2 of Lot 27, and all Lots 36, 37, 38, 39, and 40, WOODROOF SUBDIVISION, Hidalgo County, Texas . . . ."), *with* ECF No. 281-83 ("A 376.39 acre tract of land being all of Lots 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and the North 1/2 of Lot 27, and all Lots 36, 37, 38, 39, and 40, WOODROOF SUBDIVISION, Hidalgo County, Texas . . . ."). *See also* ECF No. 269 at 36:18–37:1 (testifying that Debtor was aware the Hargill Farm was sold in the early part of 2021).
[370] ECF No. 281-83.
[371] *Id.*
[372] ECF No. 269 at 58:6–17.
[373] *Id.* at 58:15–59:15.
[374] *Id.* at 40:17–23, 44:2–8.
[375] *Id.* at 68:9–13.
[376] *Id.* at 68:14–15.

and this Court held a hearing on the matter on October 12, 2021.[377]  And, according to the Release Note, Solano Land LLC owes the $1,295,000 to Cengiz, not Solano Heritage Trust.  That begs the question: why were the proceeds from the sale deposited into the Vanguard account instead of paid to Cengiz when Solano Land LLC executed the Warranty Deed with Vendor's Lien?  The answer is simple: it was to retain Debtor's alleged, although unproven, contingent liability for the debt to make Debtor's liabilities appear greater.

The Dr. Ozcelebi Note was executed for the same purpose.  On Debtor's own admission, the Lyra Note and the Dr. Ozcelebi Note are for the same $825,000 loan, but for three years the debt was owed by Lyra, not Debtor.[378]  The Lyra Note matured on January 31, 2018,[379] but was never paid despite the large sums of money that flowed in and out of Lyra each year.[380]  Instead, Debtor executed the Dr. Ozcelebi Note on July 16, 2020, even though the note was due July 1, 2020,[381]  just three months before he filed for bankruptcy.[382]  Debtor's reason for executing the note on the eve of bankruptcy and after its due date?  "To put things in writing because you (refer-ring to Dr. Chowdary's counsel) want to see everything in writing, so this is something that's in writing, other than just oral."[383]  How did Debtor know that Dr. Chowdary's bankruptcy counsel wanted to see things in writing before Debtor even filed bankruptcy?  And the loan was already evidenced by a writing—the Lyra Note—why wasn't Debtor a party to that note when it was exe-cuted in 2017 if he was liable for the debt?

The only plausible, good faith explanation for the Dr. Ozcelebi Note is that it is a modifi-cation of the Lyra Note, however, the plain terms of the Lyra Note foreclose that possibility.  The

---

[377] ECF No. 224.
[378] ECF No. 281-58.
[379] *Id.*
[380] ECF No. 281-70 at 4–5.
[381] ECF No. 281-88.
[382] ECF No. 1.
[383] ECF No. 290 at 96:6–10.

Lyra Note provides, "[t]here are no verbal or other agreements which modify or affect the terms of this NOTE.  This NOTE may not be modified or amended except by written agreement by Borrower and Lender."[384]  The Dr. Ozcelebi Note is not a written agreement between Lyra and the Clinic to modify or amend the Lyra Note and verbal agreements, like the one Debtor alludes to in justifying execution of the Dr. Ozcelebi Note, are expressly disclaimed by the Lyra Note.[385]  The truth of the matter is that the Dr. Ozcelebi Note is a sham.  Debtor executed the Dr. Ozcelebi Note just one month after the Texas Supreme Court denied his appeal,[386] in anticipation of filing bankruptcy, to inflate his liabilities.

Debtor inflated his liabilities to avoid the appearance of a two-party dispute[387] and to disguise his financial wellbeing.  As discussed above, the Solano Trust Note in the amount of $1,295,000 should have been listed in Schedule D as a contingent liability.  Thus, removing the $1,295,000 and $825,000 debts from the unsecured class, only six scheduled creditors remain.  Pursuant to Rule 3003(c)(2):

> Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

The IRS and American Express's claims were scheduled as "unknown,"[388] but neither creditor filed a proof of claim by their respective bar dates, April 14, 2021[389] and February 8, 2021.[390]  Hunter Warfield's claim was disallowed by this Court.[391]  That leaves Dr. Chowdary, with a filed

---

[384] ECF No. 281-58 at 1, ¶ 8 (emphasis in original).
[385] *Id.*
[386] ECF No. 281-87.
[387] *In re Little Creek Dev. Co.*, 779 F.2d at 1073.
[388] ECF Nos. 35, 255.
[389] 11 U.S.C. § 502(b)(9)(A).
[390] ECF No. 5 at 2, ¶ 8.
[391] ECF No. 316.

claim of $2,036,827.27,[392] Hidalgo County with a filed claim of $5,907.17,[393] and Debtor's ac-

countant, Tania Han, with a scheduled claim in the amount of $2,200.[394]  With only those three

claims remaining, Debtor's true unsecured liabilities equal $2,044,934.44, not $4,164,934.44 and

Dr. Chowdary's claim accounts for 99.6% of that indebtedness, evidence of a two-party dispute.[395]

Debtor's deception was intended to mislead creditors and this Court.  Deception with the intent to

mislead is textbook bad faith conduct.[396]

Accordingly, the Court finds that Debtor failed to properly disclose his liabilities in carry-

ing out his duties under § 521 and acted in bad faith by inflating his liabilities with the intent to

mislead creditors and this Court.

When confronted about the inaccuracies in his schedules and SoFA, Debtor defended by

feigning ignorance either about his financial affairs or his duty to make complete and accurate

disclosures.  But Debtor is a highly educated man, engaged in numerous business ventures, who

regularly discusses investment opportunities and other business matters with his allegedly business

savvy brother, Cengiz.  Debtor was more than capable of reading and understanding what the

bankruptcy schedules and statement of financial affairs required of him.  Debtor's concealment of

the true, substantial value of his interests in the Trusts, the value of his contingent interest in Mis-

sion Business and Fatih Management, four insurance policies in his name, his business connection

to Fatih Management, his true obligations to creditors, and potentially a Visa credit card was not

due to a lack of knowledge.  Rather, Debtor concealed that information to paint a bleaker financial

picture than the one that exists.

---

[392] Claim No. 1-1.  Debtor did not object to Dr. Chowdary's proof of claim.
[393] Claim No. 2-1.
[394] ECF No. 255.
[395] *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 495 (Bankr. S.D. Tex. 2013) (finding a two-party dispute where the debtor had other creditors, but 97% of the overall debt and 99% of the secured debt was held by one creditor).
[396] *See In re Unruh*, 265 F. App'x at 150.

### b. Debtor's salary is artificially calculated

Debtor's Plan states that "[Debtor] is a gastroenterologist employed by McAllen Gastro-enterology Clinic LP with an annual salary that will be increasing to $232,000 as of the Effective Date of the Plan."[397]  Debtor's current salary is $120,000.[398]  As the Subchapter V Trustee states in her Notice, "Debtor's salary has been a contentious point . . . ."[399]

Debtor first testified that his salary has been $120,000 since he worked for Dr. Chowdary in 1997.[400]  At a later hearing, Debtor testified that for "[a]t least the last five, ten years," the Clinic paid him $120,000 a year.[401]  Seconds later, however, Debtor testified that "a long time ago" his salary at the Clinic was $26 a year but was increased to $120,000 on a regular basis.[402]  The following exchange also occurred between Debtor and his attorney at the September Hearing:

> Attorney: Okay.  In the plan, it provides for a salary of $232,000.  How much is your salary today before that salary, the 232?
>
> Debtor:   It is $136,000 but in - -
>
> Attorney: Okay.
>
> Debtor:   -- addition to that, I get compensation and my malpractice insurance is $7100. I have separate IRA, $7,000. I have health insurance, $11,880. I have CME which is $1350 and travel expenses, $2,000. For my (indiscernible) I have $10,000. For car insurance, $1250. Disability insurance, $6,438. For (indiscernible), $3,640. It comes out to $43,658. And in addition to that, the company also pays (indiscernible) Medicare Texas and with those, the total expenses to the company comes out to $176,568.
>
> Attorney: So is that the salary today before the salary increase per the plan?
>
> Debtor:   That's correct.
>
> Attorney: Okay.  So you have a base of 120, a base salary of 120; is that right?

---

[397] ECF No. 259 at 2, ¶ 1.
[398] ECF No. 35 at 18, ¶ 2.
[399] ECF No. 278 at 3, ¶ 2(g).
[400] ECF No. 108 at 118:1–5.
[401] ECF No. 223 at 89:13–16.
[402] *Id.* at 89:17–91:25.

Debtor:    That's correct. Yes.[403]

As Debtor's testimony illustrates, he has contradicted himself numerous times regarding his salary, leaving creditors and this Court to question whether Debtor's true salary is $120,000 a year, $136,000 a year, or some other figure.   And it's no coincidence that Debtor's SoFA discloses Debtor's salary only for the year in which he filed for bankruptcy.[404]  The two preceding calendar years are missing.[405]  In fact, the two spaces on the SoFA designated for Debtor's disclosure of his salary for those two calendar years are altogether absent in violation of Rule 9009.[406]

Debtor testified that his current salary is only $120,000 because he solely operates a clinical practice in contrast with other gastroenterologists who also see patients at hospitals.[407]  Debtor maintains that $120,000 is a fair salary and that all his services have been fairly compensated.[408]  Nevertheless, Debtor's Amended Plan proposes a salary increase to $232,000 upon its effective date.[409]  Debtor first testified that the salary increase was based on the market area.[410]  Debtor later testified that he "requested [$232,000] and the general partner agreed to it" and that this amount was agreed on "to get over this lawsuit."[411]

---

[403] *Id.* at 45:20–46:16.
[404] ECF No. 35 at 22, ¶ 4.
[405] Official Form 107 ("Did you have any income from employment or from operating a business during this year or the two previous calendar years?").
[406] ECF No. 35 at 22–23.  Rule 9009 provides, "[t]he Official Forms prescribed by the Judicial Conference of the United States shall be used without alteration, except as otherwise provided in these rules, in a particular Official Form, or in the national instructions for a particular Official Form.  Official Forms may be modified to permit minor changes not affecting wording or the order of presenting information, including changes that: (1) expand the prescribed areas for responses in order to permit complete responses; (2) delete space not needed for responses; or (3) delete items requiring detail in a question or category if the filer indicates—either by checking 'no' or 'none' or by stating in words—that there is nothing to report on that question or category."  None of these modifications apply here.  The spaces Debtor deleted were needed for his disclosure of his employment income for 2018 and 2019.  Debtor did not make a "minor change."  He made one that affected the presenting of information.
[407] ECF No. 108 at 120:13–16.
[408] *Id.* at 117:20–23; 118:1–5.
[409] ECF No. 259 at 2, ¶ 1.
[410] ECF No. 223 at 81:4–5.
[411] *Id.* at 88:11–21.

When asked if "the dollar amount of [his] salary is directly related to Dr. Chowdary's judg-ment against [him]," Debtor responded, "[n]o, because Dr. Chowdary's judgment is real high and there is no way I can meet that requirement."[412]  Perhaps remembering that he previously testified that the salary increase was based on the market area, Debtor then explained that "we try to get to an amount where we can be close to whatever the market forces are for a gastroenterologist who would practice mainly in the office without going to the hospital."[413]  However, Debtor admitted that he could not find any comparable salary information for gastroenterologists in McAllen.[414]

Debtor's testimony that the $232,000 was based on market forces prompted inquiry into whether that makes the present salary of $120,000 "substantially under the market value of [Debtor's] service."[415]  Debtor said no.[416]  Debtor's testimony is nonsensical.  If "market forces" dictate a $232,000 salary, how is $120,000 "fair?"  If the market rate is $232,000, then Debtor's $120,000 salary is substantially under market value.  If, on the other hand, Debtor's $120,000 salary is not substantially under market value, then the market rate can't be $232,000.  The Court finds that Debtor's proposed salary is not based on market forces.

Further evidence supports that finding.  First, in response to questions in Schedules I and J about whether Debtor expects an increase or decrease in income or expenses in the year after filing bankruptcy, Debtor added a note that, "[t]he Debtor is evaluating its options in order [sic] obtain confirmation of plan of reorganization."[417]  Second, Debtor's Amended Plan states that Debtor requested an even greater salary increase than the $232,000, but Mrs. Ozcelebi, as manager of Faith Management, the general partner of the Clinic, denied that request.[418]  Problematically, the

---

[412] *Id.* at 88:22–25.
[413] *Id.* at 89:1–7.
[414] *Id.* at 83:16–19.
[415] *Id.* at 89:8–11.
[416] *Id.* at 89:12.
[417] ECF No. 35 at 19, 21, ¶¶ 13, 24.
[418] ECF No. 259 at 2, ¶ 1 n.3.

evidence demonstrates that Debtor is the manager of Fatih Management.  Fatih Management is a manager-managed LLC and its Certificate of Formation and a 2019 Texas Franchise Tax Public Information Report list Debtor as manager.[419]  Debtor also testified that he is the manager of Fatih Management despite previously testifying that Mrs. Ozcelebi and Cengiz were the managers of Fatih Management.[420]  No documentary evidence demonstrates that Cengiz is a manager of Fatih Management.  Mrs. Ozcelebi is identified as a manager of Fatih Management in two 2007 Assignment of Partnership Interest but is not identified as a manger in any documents filed with the Texas Secretary of State.[421]  Mrs. Ozcelebi is however listed as a director in a 2019 Texas Franchise Tax Public Information Report and on the Texas Secretary of State website.[422]  Based on the evidence, the Court finds that despite his testimony, Debtor has at least some, if not all, decision-making power over his salary as manager of Fatih Management.

Third, Debtor testified that once his salary increases he will no longer receive the approximately $120,000 in trust distributions reflected in Schedule I.[423]  Debtor was asked if "the doubling of the salary is to turn into salary what used to be trust distributions."[424] Debtor responded: "[i]t was going to be distributed to the Trust, but right now I'll get the salary so I can pay off the creditors."[425]  Debtor's Schedule I represents that Debtor was making $120,000 a year and receiving approximately $120,000 in trust distributions for a total income of $240,000 a year pre-bankruptcy.[426]  Debtor's SoFA reflects that Debtor received $222,098.50 in income from trust distributions in 2018 and $255,180.43 in 2019.[427]  Adding Debtor's alleged yearly salary of $120,000,

---

[419] ECF Nos. 281-57, 286-3.
[420] ECF Nos. 290 at 110:4–6, 223 at 46:14–48:10.
[421] ECF No. 281-37.
[422] ECF No. 286-3 at 5–6.
[423] ECF No. 108 at 120:4–8.
[424] *Id.* at 120:9–10.
[425] *Id.* at 120:11–12.
[426] ECF No. 255.
[427] ECF No. 35 at 23, ¶ 5.

Debtor's total income was $342,098.50 in 2018 and $375,180.43 in 2019.  Considering those cal-

culations, the proposed salary increase results in less income for Debtor and thus, less disposable

income for distribution.

The evidence demonstrates that Debtor's proposed salary was artificially calculated to mis-

lead creditors and this Court into believing that Debtor was making a good faith effort to put forth

a feasible plan of reorganization, when in reality Debtor's salary was calculated to ensure that he

received less total income post-bankruptcy than pre-bankruptcy, thereby reducing the money avail-

able to creditors.  Thus, not only did Debtor attempt to inflate his liabilities as the Court found

above, but he also attempted to arbitrarily reduce the amount of money available to satisfy those

liabilities.

Accordingly, this Court finds that Debtor has not been truthful about his current salary,

intentionally calculated both his current and proposed salary in bad faith and concealed his deci-

sion-making authority over his salary as manager of Fatih Management.

### c. Debtor was dishonest about transfers to the Trusts, the Trusts' distributions, and the benefits thereof

Disbursements from the Trusts have played a starring role in this case.  Debtor testified

that the money derived from his services at the Clinic, less expenses and his salary, is transferred

to Lyra on a regular basis.[428]  Debtor also testified that at least since 2010, money has been flowing

directly or indirectly from the Endoscopy Center to Vega.[429]  Transfers flowing from the Clinic to

Lyra and the Endoscopy Center to Vega continued throughout 2021.[430]  Debtor's schedules and

SoFA establish that the Trusts' disbursements were a significant part of his income until Debtor

---

[428] ECF Nos. 108 at 92:8–11, 93:1–3, 223 at 66:16–67:4.
[429] ECF Nos. 108 at 115:17–24, 223 at 72:3–77:14.
[430] ECF Nos. 108 at 115:17–24, 223 at 72:3–77:14, 290 at 100:1–15.

filed for bankruptcy.[431]   Post-bankruptcy, however, Debtor allegedly stopped receiving distribu-
tions.[432]   Debtor's Amended Plan states that "[b]ecause Lyra and Vega denied contributing any
monies towards Chowdary's claim, Debtor's [projected disposable income] does not include
monthly trust disbursements received from Lyra and Vega, as those amounts were previously used
to primarily finance Debtor's children's education costs, as exemplified in § 8 of Schedule J."[433]
Debtor's Plan also states, "[b]ecause Lyra and Vega have denied contributing any amounts towards
Chowdary's claim, [Debtor's First Plan Supplement] should not be used as an indicator of potential
additional funds available to pay creditors."[434]   Debtor's First Plan Supplement discloses about
$327,000 in loans and distributions from Lyra and Vega since Debtor's petition date.[435]

As detailed below, Debtor has not been truthful about the Trusts' disbursements or how
those disbursements have benefited him, directly or indirectly, at the expense of the estate and his
creditors.

### i.   Transfers from the Clinic and the Endoscopy Center to the Trusts

At the September 2021 Hearing, Debtor testified that "typically the general partner"—
identifying Mrs. Ozcelebi and Cengiz as such—transfers money from the bank account of the
Clinic to the bank account of Lyra.[436]   As noted above,  there is no evidence that Cengiz is a control
person of the general partner; Mrs. Ozcelebi is listed as the director and a member of Fatih Man-
agement and Debtor is listed as the manager of that manager-managed LLC.  At the November 29,
2021 Hearing, Debtor pointed the finger at Mrs. Ozcelebi, testifying that 99% of the transfers from
the Clinic and the Endoscopy Center to Lyra and Vega are made by her, stating that in the past

---

[431] ECF No. 35 at 19, 23.
[432] ECF No. 285 at 2, ¶ 4.
[433] ECF No. 259 at 4, ¶ 7.
[434] Id. at 4–5, ¶ 8.
[435] ECF No. 265 at 6–13.
[436] ECF No. 223 at 68:18–23.

he's made maybe one or two transfers.[437]  However, at the January 2021 Hearing, Mrs. Ozcelebi was asked: "have you ever gone online to the bank account and initiated a transfer from the medical practice bank account to the Trust?"[438]  She said no.[439]

Accordingly, as manager of Fatih Management and in light of Mrs. Ozcelebi's contradictory testimony, the Court finds Debtor's testimony false, misleading, and a mere ploy to distance himself from the appearance of any control over the Trusts.

### ii.  Trust Distributions made for Debtor's personal benefit

Debtor's Schedule I shows that Debtor receives $5,203.04 in monthly income from Lyra and another $5,162.36 from Vega, for a total of $10,365.40.[440]  Schedule I reflects that Mrs. Ozcelebi receives the same amount.[441]  Together then, Debtor and Mrs. Ozcelebi's combined yearly income from Vega and Lyra is $248,796.60.  Debtor's First Plan Supplement lists about $249,000 in distributions and loans from Vega and Lyra in the first nine months of 2021 alone[442]—more than the combined trust income listed in Debtor's Schedule I.  Despite those disbursements, Debtor claims that since he filed bankruptcy, he stopped receiving disbursements and included them on Schedule I merely because it was "the best information available for the Debtor's historical income on the Petition Date."[443]

While most of the 2021 disbursements listed in Debtor's First Plan Supplement were made to third parties, there were several disbursements made directly to Mrs. Ozcelebi:

| Date | Memo | Type | Trust | Amount |
|------|------|------|-------|--------|
| 1/1/21 | Spring tuition for children | Loan | Lyra | $26,275 |

---

[437] ECF No. 290 at 101:3–22.
[438] ECF No. 108 at 61:12–14.
[439] *Id.* at 61:15.
[440] ECF No. 35 at 19, ¶ 8h.
[441] *Id.*
[442] ECF No. 265 at 6–13.
[443] ECF No. 285 at 1–2, ¶¶ 3–4.

| 1/25/21 | For children's school and living expenses | Loan | Lyra | $2,420 |
|---------|---------|---------|------|--------|
| 1/26/21 | None | Loan | Lyra | $6,000 |
| 5/10/21 | Children moving, furniture, relocation, college tuition balance, clothing, apartment down payment, rent, utility | Distribution | Vega | $28,000 |
| 1/20/21 | None | Loan | Vega | $12,000 |
| 8/31/21 | None | Loan | Vega | $9,000 |
| 9/1/21 | None | Loan | Vega | $6,000 |
| | | | **Total:** | **$89,695** |

At the January 2022 Hearing, with respect to the pre-bankruptcy disbursements from Lyra and Vega listed on his Schedule I, Debtor testified, "I didn't have a bank account so it was going directly to my wife's account."[444]  Beyond representing to this Court that he is no longer receiving trust disbursements, Debtor provided no evidence that disbursements for his use or benefit are not still being deposited into Mrs. Ozcelebi's bank account.  And given that direct disbursements are still being made to Mrs. Ozcelebi, Debtor's representation is highly suspect.  To the extent any disbursements made directly to Mrs. Ozcelebi were for Debtor or were later paid to third parties on Debtor's behalf, those amounts should have been disclosed in Debtors MORs.

### iii.  Payments made on Debtor's behalf or for his benefit

As discussed above, Debtor's MORs contained numerous inaccuracies.  Those inaccuracies included Debtor's failure to disclose payments made on his behalf.  Pursuant to § 1187(b), incorporating §§ 308 and 1116(4), and Rule 2015(a)(6), Debtor is required to file monthly operating reports.  Debtor is required by Rule 9009 to use Official Form 425C, Monthly Operating Report for Small Business Under Chapter 11.  That form asks, "has anyone made payments on your

---

[444] ECF No 340 at 63:8–18.

behalf?" Debtor consistently answered "no" on his 2021 MORs,[445] despite evidence to the contrary as discussed below.

### a) Payment of Debtor's adult children's expenses

Debtor has three adult children.[446] The oldest attends dental school at Texas A&M in Dallas and the younger two recently graduated from Texas A&M in May or June 2021.[447] Debtor's Schedule J lists $13,581.42 in expenses for "childcare and children's educational costs."[448] At the January 2021 Hearing, Debtor testified that his paycheck and Trust distributions were used to cover, inter alia, his children's college tuition.[449] Debtor's First Plan Supplement reflects that $28,695 in loans were made from Lyra to Mrs. Ozcelebi for the children's expenses and $132,737.97 in distributions were made from Vega to various entities for the children's expenses, totaling $161,432.97 from January 4, 2021 to September 30, 2021.[450]

At the January 2022 Hearing, Debtor testified that: (1) since he filed bankruptcy, "we" have gradually quit giving money to the children; (2) his children are no longer getting money from the Trusts for their education expenses; and (3) Debtor and Mrs. Ozcelebi decided that they would stop funding their children's education expenses and instead the children would take out loans.[451] The evidence suggests otherwise.

First, as noted above, in the first nine months of 2021 alone, $161,432.97 was distributed from the Trusts for the children's expenses, an average of $17,937 per month.[452] Comparatively, in all 12 months of 2020, $188,178.13 was distributed from the Trusts for the children's expenses,

---

[445] ECF Nos. 123, 129, 140, 150, 158, 181, 189, 238, 260.
[446] ECF No. 35 at 20, ¶ 2.
[447] ECF Nos. 281-65 at 5:18–22, 340 at 160:15–21, 107:14–24.
[448] ECF No. 35 at 21, ¶ 8.
[449] ECF No. 108 at 110:13–18.
[450] ECF No. 265 at 7–11.
[451] ECF No. 340 at 9:16–10:7, 65:7–67:8.
[452] ECF No. 265 at 7–11. The dollar amount represents $28,695.00 in loans from Lyra to Mrs. Ozcelebi for the children's expenses and $132,737.97 in distributions from Vega for same.

an average of $15,681.51 per month.[453]   Second, while the children's expenses were discussed at the January, September, and November 2021 Hearings, until the January 2022 Hearing, Debtor never mentioned that the children were taking out loans and there is no evidence in the record to confirm the existence of such loans.  Third, Debtor's Second Plan Supplement states that "[i]n 2021, . . . the children began to receive distributions from Vega directly and were required to make their own payments for college and living expenses."[454]   Fourth, Mrs. Ozcelebi testified that over the past few years she's been moving the children toward paying their own expenses and "asked the trustee to go ahead and disburse funds now directly for [the children's] expenses related to payment for school . . . ."[455]  The evidence demonstrates that not only are the children still receiving distributions from the Trusts, but that there has been no reduction in the amount of distributions made to cover the children's expenses, directly contradicting Debtor's testimony.

Moreover, Debtor testified that (1) he was unaware disbursements were being made from the Trusts for his children's expenses; (2) his wife did not consult him before giving instructions to the Trusts to distribute money for the children's expenses, and (3) the January 2022 Hearing was the first time he was seeing the disbursements for his children's expenses in his First Plan Supplement "line by line," but that it was not his first time seeing the document.[456]   In direct contradiction, Mrs. Ozcelebi testified that she informs Debtor when she makes requests to the Trusts for the children's expenses.[457]  Debtor's own testimony at a previous hearing also contradicted his January 2022 testimony.  In response to the question "[a]nd the trust also made payment on your behalf to cover your children's educational and living expenses [in September 2021]; is

---

[453] *Id.* at 7–9.  The dollar amount represents $75,154.72 in loans from Lyra to Mrs. Ozcelebi for the children's expenses and $113,023.41 in distributions from Vega for same.
[454] ECF No. 285 at 1–2, ¶ 3.
[455] ECF No. 340 at 89:16–90:23.
[456] *Id.* at 27:8–28:2. Debtor's First Plan Supplement was filed on November 12, 2021.  ECF No. 265.
[457] ECF No. 340 at 96:13–24.

that correct?"[458]  Debtor stated, "I mean, it is my wife and my - - we are - - I mean, it is my family, yes."[459]  Debtor also testified that he authorized Chamberlain to file the First Plan Supplement and reviewed the document before it was filed.[460]  Given that Debtor testified about his First Plan Supplement and the distributions made for his children's living expenses at the November Hearing, the Court finds that his later testimony that he was unaware disbursements were being made for his children's expenses is blatantly untrue.  Debtor deliberately lied under oath.

Finally, Debtor scheduled $13,581.42 per month for his children's educational and living expenses in Schedule J.[461]  Presently, those expenses are being paid by the Trusts.[462]  Yet, Debtor and Mrs. Ozcelebi are the only beneficiaries with a vested interest in the Trusts.[463]  The children have a vested remainder in the Trusts, which does not entitle them to possession or enjoyment until both Debtor and Mrs. Ozcelebi pass away.[464]  Therefore, any payments made from the Trusts for the children's expenses are made on behalf of Debtor and at a minimum, should have been disclosed on Debtor's MORs.

Accordingly, this Court finds that in accordance with § 1187(b) Debtor was required but failed to disclose the payments made by Lyra and Vega for his adult children's educational and living expenses in his Monthly Operating Reports and lied under oath.

### b)  Payment of Debtor's attorneys' fees

---

[458] ECF No. 290 at 120:18–121:17.
[459] *Id.* at 121:18–19.
[460] *Id.* at 51:25–52:10.
[461] ECF No. 35 at 20–21.
[462] ECF No. 265.
[463] ECF Nos. 247-2, 247-3, 247-4.
[464] ECF Nos. 247-2, 247-3, 247-4; *Shearrer v. Holley*, 952 S.W.2d 74, 77 (Tex. App.—San Antonio 1997, no writ) ("For example, in *Rust*, the Austin court of appeals held that 'a devise by A to B for life with remainder *at his death* to C creates a vested remainder in C upon the death of A, subject to B's life estate,' and that the words 'at his death' refer to the time when the right of possession begins, not when the remainder vests . . . . More recently, in *McGill*, the supreme court, citing *Rust*, interpreted the words 'at the death of my said son' as referring only to the time of enjoyment or possession, rather than vestment.") (citations omitted).

Section 503(b) provides, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . ." On July 20, 2021, this Court entered an order awarding Chamberlain $188,358.11 in fees and expenses.[465] Counsel's Declaration Supplement states, "[p]ursuant to paragraph 6 of the Debtor's Amended Subchapter V Plan of Reorganization, on October 29, 2021 the Lyra Heritage Trustee paid [Chamberlain, Hrdlicka, White, Williams & Aughtry] $116,600.78 for fees incurred by the Debtor that remained unpaid after deduction from the security retainer."[466] There are numerous problems related to this payment.

First, the Court is unable to determine how much was actually paid to Chamberlain by Lyra. This Court's July 20, 2021 order permitted Debtor's attorneys to "draw down the total amount of its pre-petition retainer of $69,394.48 which includes the $9,999 in unbilled time."[467] According to Counsel's Declaration Supplement, $116,600.78 remained unpaid after deduction from the retainer. The difference between $188,358.11 and $69,394.48 is $118,963.63, not $116,600.78. Counsel's Declaration Supplement also states that the $116,600.78 paid by Lyra includes $17,696.91 for non-bankruptcy work that was charged off.[468] However, Debtor's Amended October 2021 MOR says that Lyra paid Debtor's attorneys $134,297.69 of which $17,696.91 was an overpayment.[469] Either Debtor's Amended MOR or Counsel's Declaration Supplement is incorrect.

Second, although Chamberlain's fees were allowed by this Court pursuant to § 503, those fees should not have been paid by Lyra on Debtor's behalf "[p]ursuant to paragraph 6 of the Debtor's Amended Subchapter V Plan of Reorganization"[470] because Debtor's Plan has not been

---

[465] ECF No. 180 at 2, ¶ 4.
[466] ECF No. 264 at 1–2, ¶ 4.
[467] ECF No. 180 at 2, ¶ 5.
[468] ECF No. 264 at 1–2, ¶ 4.
[469] ECF No. 327 at 5.
[470] ECF No. 264 at 1–2, ¶ 4.

confirmed and there has been no determination as to whether Debtor's interest in Lyra is property of the estate. It was improper for Debtor to perform under an unconfirmed plan to the detriment of his creditors.

Third, Lyra disbursed $17,696.91 for "non-bankruptcy work performed that Chamberlain had charged off and did not intend to seek payment from the bankruptcy estate."[471] Thus, the October 29, 2021 payment from Lyra covered fees not approved by this Court's July 20, 2021 order. The parties have since agreed that the $17,696.91 overpayment will be returned to Chamberlain's IOLTA account and used to pay other administrative expenses.[472]

Fourth, Debtor's original October 2021 MOR did not disclose that a payment to Chamberlain was made on Debtor's behalf.[473] It wasn't until a month a half later that Debtor amended his October 2021 MOR to disclose the payment[474]—only after the November 2021 Hearing at which Debtor was questioned about and admitted that the MOR was wrong and after the UST filed its Motion to Convert arguing that Debtor made a material misrepresentation in his October 2021 MOR by failing to disclose Lyra's payment to Chamberlain as a payment made on Debtor's behalf.[475]

Accordingly, the Court finds that Debtor failed to timely make full and candid disclosure of Lyra's payment on Debtor's behalf to Chamberlain for its fees, as Debtor was required to do pursuant to § 1187(b).

### iv. Debtor's Trust requests

---

[471] *Id.*
[472] ECF No. 337 at 2.
[473] ECF No. 268.
[474] ECF No. 327.
[475] ECF No. 296 at 7, ¶ 25.

Debtor's Second Plan Supplement states that Debtor has neither requested nor received any trust distributions post-petition.[476]  That is untrue.  Debtor testified that he made a request to the trustee of Lyra to pay Chamberlain's fees.[477]  That payment was made on October 29, 2021.[478]  At the January 2021 Hearing, Debtor also testified that he asked his brother and his nephew, the trustees of the Trusts, to pay Dr. Chowdary's claim.[479]  Thus, it was known to Debtor before the Second Plan Supplement was filed that Debtor made a post-petition request from the Trusts.  Again, at the November Hearing, Debtor testified that on October 12th he made a request and on October 15th it was denied by Cengiz.[480]  Debtor admitted that the Second Plan Supplement was wrong.[481]

Moreover, it is well established by Debtor's testimony that in the past few years, whenever Debtor requested a distribution from Lyra or Vega, the request was granted.[482]  And although Debtor testified that the Trusts were set up to protect assets from his creditors,[483] when Debtor requested a distribution to pay Chamberlain—an unsecured, albeit, administrative creditor—the request was granted.[484]  Yet when Debtor requested to pay Dr. Chowdary—another unsecured creditor—the request was denied.[485]  The decision to pay Chamberlain's fees from Lyra, but not Dr. Chowdary's claim pursuant to a plan of reorganization was arbitrary and without a proper business justification.

---

[476] ECF No. 285 at 2, ¶ 4.
[477] ECF No. 290 at 122:8–14, 126:15–24.
[478] ECF No. 264 at 1–2, ¶ 4.
[479] ECF No. 108 at 111:8–21, 112:17–113:4.
[480] ECF No. 290 at 48:13–49:7.
[481] *Id.* at 49:21–24.
[482] ECF No. 108 at 109:23–5; 127:17–23.
[483] *Id.* at 102:22–24.
[484] ECF No. 264 at 1–2, ¶ 4.
[485] ECF Nos. 108 at 111:8–21, 112:17–113:4, 290 at 48:13–49:7.

Considering the totality of the circumstances, Debtor here did not file this bankruptcy case due to financial crisis.  He was not "seeking to preserve or create some value that would otherwise be lost outside of bankruptcy" or to "maximiz[e] property available to satisfy creditors."[486]  In fact, when Debtor filed bankruptcy the substantial trust disbursements he received pre-bankruptcy were allegedly stripped from him, reducing property available to satisfy creditors.  And Debtor made his best attempt to conceal his true financial condition in this case by concealing the true value of his interest in the Trusts, the value of his community property interest in Mission Business and Fatih Management, the four insurance policies in his name, his business connection, inflating his liabilities and artificially calculating his salary to distort his debt-to-income ratio, and lying to this Court all while under oath.  All the while, Debtor's wife, Mrs. Ozcelebi, and his adult children received hundreds of thousands of dollars in disbursements from the Trusts for their expenses.

The truth of the matter is that after two decades of contentious litigation, ending with a nearly two-million-dollar judgment in favor of Dr. Chowdary and an unsuccessful appeal to the Texas Supreme Court, Debtor filed this bankruptcy case to delay Dr. Chowdary's recovery. Debtor's numerous lies and failure to make full and candid disclosure throughout his bankruptcy case evidences a pattern of reckless and cavalier disregard for the truth, which courts have found indicative of fraudulent intent, or in this case, bad faith.[487]

Accordingly, this Court finds cause to convert or dismiss this case pursuant to § 1112(b)(1) for Debtor's bad faith not only in filing this case, but in carrying out his duties under §§ 521 and 1187(b) of the Bankruptcy Code.

---

[486] *In re Roman Catholic Church of the Archdiocese of New Orleans*, 632 B.R. at 599 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 Lasalle St. P'ship*, 526 U.S. at 453).
[487] *See In re Sholdra*, 249 F.3d at 383 (citing *Economy Brick Sales, Inc. v. Gonday (In re Gonday)*, 27 B.R. 428, 432 (Bankr. M.D. La. 1983)).

5. **Whether unusual circumstances establish that converting or dismissing this case is not in the best interest of creditors and the estate**

Pursuant to § 1112(b)(2):

The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

>> (i) for which there exists a reasonable justification for the act or omission; and

>> (ii) that will be cured within a reasonable period of time fixed by the court.

The phrase "unusual circumstances" is not defined in the Bankruptcy Code, but "the word 'unusual' contemplates facts that are not common to chapter 11 cases generally."[488]  Determining whether unusual circumstances exist is a fact intensive inquiry.[489]

Debtor's Post-Hearing Brief argues that:

The Amended Plan will bring finality and totality for an independent investigation that is under the Court's jurisdiction. For that and the reasons elucidated above, the Court should find that Debtor has presented unusual circumstances providing that conversion or dismissal is not in the best interests of creditors and the estate, Debtor's Amended Plan has a reasonable likelihood of being confirmed, and the grounds for converting or dismissing the case under § 1112(b)(4)(B)–(P) include an act for which exists a reasonable justification, and which will be cured within a reasonable amount of time (being the highly nuanced legal issues involving trust distributions, which were previously rectified by disclosure).[490]

---

[488] *In re Triumph Christian Ctr., Inc.*, 493 B.R. at 496 (citing COLLIER ¶ 1112.05[2]).
[489] *Id.*
[490] ECF No. 351 at 37, ¶ 86.

The Amended Plan's ability to bring finality and an independent investigation under this Court's jurisdiction is not an "unusual circumstance" establishing that conversion or dismissal is not in the best interest of the estate or its creditors.  First, all chapter 11 plans are intended to bring finality by giving the debtor the opportunity to successfully reorganize and exit the bankruptcy system. Second, Debtor's statement seems to suggest that there is a need for an independent investigation in this case, which only convinces this Court all the more that conversion is necessary.  No exten-uating circumstances impacted Debtor's ability to fully comply with the Bankruptcy Code in this case.  Cause for conversion or dismissal here is based solely on the numerous findings of bad faith carefully detailed above.  Additionally, given those findings, there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that "[t]he proponent of the plan complies with the applicable provisions of this title."

Accordingly, the Court finds that there are no unusual circumstances establishing that con-verting or dismissing this case is not in the best interest of creditors and the estate and therefore, this case must be converted or dismissed.

### 6.  Whether this Court should convert this case to chapter 7 or dismiss this case

Upon finding cause, a court must decide whether conversion or dismissal is in the best interest of the creditors and the estate.[491]  There is no bright line test to determine whether conver-sion or dismissal is in the best interest of creditors and the estate.[492]  The decision is left to the Court's discretion.  Here, the UST and Dr. Chowdary ask this Court to convert this case to chapter 7.  Although Debtor opposes conversion and dismissal, Debtor's Post-Hearing Brief states, "not only would dismissal of the case likely provide no recovery to unsecured creditors but based on

---

[491] 11 U.S.C. § 1112(b)(1).
[492] *In re Fleetstar LLC*, 614 B.R. 767, 781 (Bankr. E.D. La. 2020) (quoting *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011)).

the long and contentious history between Debtor and Chowdary, it seems clear that dismissal would bring no resolution to their disputes."[493]  The Court agrees.

On Debtor's own admission, dismissal of this case is unlikely to result in recovery for Debtor's unsecured creditors, namely Dr. Chowdary.  Therefore, despite the increased administrative costs that may stem from conversion, a chapter 7 trustee will be able to investigate and reach Debtor's assets for the benefit of Debtor's creditors[494]  Also on Debtor's own admission, "it seems clear that dismissal would bring no resolution" to the dispute between Debtor and Dr. Chowdary.  Dr. Chowdary's judgment is final, Debtor's appeal to the Texas Supreme Court was denied.  There is nothing left to do, but for Dr. Chowdary to collect his judgment.  Keeping this case in the bankruptcy system will bring finality to the decades long fight between Dr. Chowdary and Debtor.[495]  Finally, given the numerous findings of bad faith and misconduct in this case, a chapter 7 trustee is in the best position to supervise the estate to ensure the protection of both the estate and the interest of Debtor's creditors.[496]

Accordingly, this Court finds that conversion to chapter 7 is in the best interests of creditors and the estate in this case.

## D.  Removal of Debtor as Debtor-in-Possession

Before the hearing on the UST's Motion to Convert, this Court issued an order notifying the parties that in conjunction with the UST's Motion to Convert, it would sua sponte to consider whether Debtor should remain in possession or be removed pursuant to § 1185(a),[497] which provides:

---

[493] ECF No. 251 at 36, ¶ 86.
[494] *See In re Fleetstar LLC*, 614 B.R. at 782.
[495] *Id.*
[496] *Id.*
[497] ECF No. 312.

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this chapter.[498]

Congress enacted § 1185 as part of the Small Business Reorganization Act of 2019, which became effective February 19, 2020. Three years after its enactment, however, there exists no governing authority which outlines the standards the court should consider in determining whether to remove a debtor in possession under § 1185. Nevertheless, because this Court finds cause to convert this case to one under chapter 7 as discussed above, the alternative consideration as to whether the debtor-in-possession should be removed this Court need not determine the applicable standards because the question is moot.

Accordingly, removal of debtor-in-possession pursuant to § 1185(a) is moot.

**E.   Confirmation and related objections**

This Court held a hearing on confirmation of Debtor's Amended Plan on November 29, 2021. At the conclusion of that hearing this Court took confirmation under advisement.[499] Before this Court ruled on confirmation, however, the UST filed its Motion to Convert and Dr. Chowdary joined in that motion. Because this Court finds cause to convert this case to one under chapter 7 and that finding is dispositive, confirmation of Debtor's Amended Plan[500] is denied as moot. Likewise, "Chowdary's Objection to Debtor's First Amended Plan,"[501] the "Notice of Subchapter V Trustee's Position on Debtor's Amended Plan of Reorganization,"[502] and the "Objection of the

---

[498] 11 U.S.C. § 1185(a).
[499] Min. Entry November 29, 2021.
[500] ECF No. 259.
[501] ECF No. 277.
[502] ECF No. 278.

United States Trustee to Debtor's Amended Subchapter V Plan of Reorganization"[503] are denied as moot.

**F. Criminal referral to the United States Attorney for investigation of potential crimes under 18 U.S.C. §§ 152 and 157**

Pursuant to 18 U.S.C. § 3057(a), a court "having reasonable grounds for believing that" violation under chapter 9 of title 18 or other laws of the United States related to debtors "has been committed, or that an investigation should be had in connection therewith," has an obligation to report the facts and circumstances surrounding that case to the United States Attorney.  Based on the findings and conclusions above, this Court has reasonable grounds to believe that an investigation by the United States Attorney for potential crimes under § 152, including but not limited to subsections (2) and (3), and § 157 is warranted.

**IV.  CONCLUSION**

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED April 1, 2022

_____
Eduardo Rodriguez
United States Bankruptcy Judge

---

[503] ECF No. 279.